NIGHT BOX
FILED

MAY 24 2005

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____ -CIV- _____

CIV - SEITZ

/ MCALILEY

ROBERT QUINTANA & ALINA M.
QUINTANA, On Behalf of themselves and
all others similarly situated,

            Plaintiffs,

v.

MORGAN STANLEY DW, INC.,

            Defendant.

**DEFENDANT MORGAN STANLEY DW, INC.'S NOTICE
OF REMOVAL TO THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Please take notice that, pursuant to 28 U.S.C. §§ 1441, 1446, and 1453, and 28

U.S.C. § 1332, defendant Morgan Stanley DW, Inc. (the Defendant), by its undersigned

attorneys, submits this Notice of Removal from the Circuit Court of the Eleventh Judicial Circuit

in and for Miami-Dade County, Florida, in which the above-captioned case is now pending, to

the United States District Court for the Southern District of Florida and, in support of said notice,

states as follows:

**NATURE OF THE ACTION**

1.      This action, styled *Robert Quintana & Alina M. Quintana, On behalf of*

*themselves and all others similarly situated v. Morgan Stanley DW, Inc.*, Case No. 05-08838 CA

13, was filed in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County,

Florida, on April 29, 2005. The Complaint ("Cplt.") was served on the Defendant on May 5,

2005, less than thirty days prior to the date of this Notice of Removal. Pursuant to 28 U.S.C. § 1446(a), a copy of the Complaint and process are attached hereto as Exhibit A.

## PARTIES

2.    Defendant Morgan Stanley DW, Inc. (MSDW) is a Delaware corporation with its principal place of business in New York.

3.    Plaintiffs Robert and Alina Quintana were clients of MSDW. (Cplt. ¶ 16.) Plaintiffs are residents of Florida.

4.    Plaintiffs purport to represent a class that is defined as all "individuals or entities who filed arbitration claims against Morgan Stanley before the NASD or the New York Stock Exchange ("NYSE") and received an Arbitration Award between January 1, 1999 through April 21, 2005." (Cplt. ¶ 1.) Plaintiffs allege that "there are thousands of members of the Class located throughout the United States." (Cplt. ¶ 26.)

## BASIS FOR REMOVAL

5.    Plaintiffs' class action fits squarely within the definition of federal diversity jurisdiction as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified as amended in scattered sections of 28 U.S.C.), and is precisely the type of large, interstate lawsuit that Congress intended to put before the federal courts.

## PLAINTIFFS' CLAIMS

6.    This is a purported class action on behalf of MSDW customers who received NASD or NYSE arbitration awards between January 1, 1999, and April 21, 2005. (Cplt. ¶ 1.) The Complaint asserts common law claims of breach of contract, negligence, and breach of fiduciary duty based on MSDW's recent disclosure that it has come to appreciate that there are additional sources that might contain responsive e-mail that may not have been otherwise produced in certain proceedings. (Cplt. ¶¶ 4, 31-36, 37-42, 43-49.)

2

7.      Plaintiffs seek, individually and on behalf of the class, $100 million in compensatory damages, plus interest, costs, attorney's fees, punitive damages, and any other relief deemed just and proper by the court. (Cplt. ¶¶ 31-36, 37-42, 43-49.)

## APPLICABILITY OF CLASS ACTION FAIRNESS ACT TO THIS ACTION

8.      The new diversity jurisdiction provisions enacted by the Class Action Fairness Act are effective as of February 18, 2005, and apply to "any civil action commenced on or after" that date. *See* § 9, 119 Stat. at 14.

9.      Under 28 U.S.C. § 1332(d)(2), a district court now has "original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which...(A) any member of a class of plaintiffs is a citizen of a State different from any defendant."

10.      A "class action" is defined as any civil action filed under Fed. R. Civ. P. 23 or "similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). Class members are defined as "the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action." *Id.* § 1332(d)(1)(D).

11.      For the purposes of the amount in controversy requirement of 28 U.S.C. § 1332(d)(2), "the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." *Id.* § 1332(d)(6).

12.      The provisions of the Class Action Fairness Act of 2005 apply to Plaintiffs' class action because Plaintiffs filed their lawsuit on April 29, 2005—more than two months after the Act's February 18 effective date. *See* § 9, 119 Stat. at 14.

3

13.     Plaintiffs' lawsuit meets the definition of "class action" under 28 U.S.C. § 1332(d)(1)(B) because it was filed under the class action provision of the Florida Rules of Civil Procedure, Fla. R. Civ. P. 1.220. (Cplt. ¶ 29.)

14.     Plaintiffs' lawsuit is one in which "any member of a class of plaintiffs is a citizen of a State different from any defendant," 28 U.S.C. § 1332(d)(2)(A), because their class is defined as all "individuals or entities" who received an arbitration award in an NASD or NYSE proceeding against MSDW between January 1, 1999 and April 21, 2005. (Cplt. ¶¶ 1, 25.) As Plaintiffs themselves explain, there are likely "thousands of members of the Class located throughout the United States." (Cplt. ¶ 26.) There are undoubtedly members of the class as defined by Plaintiffs, including Plaintiffs themselves, that are not citizens of Delaware or New York, where Defendant is a citizen. *See* 28 U.S.C. § 1332(c)(1) (defining corporate citizenship as "any State in which [a corporation] has been incorporated and the State where it has its principal place of business").

15.     Plaintiffs' lawsuit meets the $5,000,000 amount in controversy requirement of 28 U.S.C. § 1332(d)(2) because Plaintiffs claim $100 million in compensatory damages individually and on behalf of the class. (Cplt. ¶¶ 31-36, 37-42, 43-49.) This $100 million figure is properly considered the amount in controversy because "the claims of the individual class members shall be aggregated" under 28 U.S.C. § 1332(d)(6).

16.     When a plaintiff seeks damages exceeding the amount in controversy requirement, "a removing defendant may rely on the plaintiff's valuation of the case to establish the amount in controversy unless it appears to a legal certainty that the plaintiff cannot recover the amount claimed." *Mitchell v. Brown & Williamson Tobacco Corp.*, 294 F.3d 1309, 1315 (11th Cir. 2002); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-289 (1938).

4

17.     This Court cannot decline jurisdiction under the discretionary provisions of 28 U.S.C. § 1332(d)(3) because the provisions require that "the primary defendants are citizens of the State in which the action was originally filed." *Id.* Plaintiffs filed their Complaint in Florida state court; MSDW is a citizen of New York and Delaware.

18.     This Court cannot decline jurisdiction under the mandatory provisions of 28 U.S.C. § 1332(d)(4) because the provisions similarly require that a defendant is a citizen of the State in which the action was originally filed. *Id.* §§ 1332(d)(4)(A)(i)(II)(cc), 1332(d)(4)(B). As noted above, the Complaint was filed in Florida state court and the Defendant is a citizen of Delaware and New York.

19.     This Court cannot decline jurisdiction under 28 U.S.C. § 1332(d)(5)(B) because Plaintiffs' class, as defined by Plaintiffs, exceeds 100 members. *Id.* Indeed, Plaintiffs suggest that their class has "thousands of members." (Cplt. ¶ 26.)

20.     In addition to satisfying all of the jurisdictional requirements of 28 U.S.C. § 1332(d), Plaintiffs' lawsuit is precisely the type of case that Congress intended to bring within the federal courts' purview when it passed the Class Action Fairness Act of 2005.

21.     Specifically, Congress noted in the Act's legislative findings that "[a]buses in class actions undermine the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers" and that state courts were "keeping cases of national importance out of Federal court" and "making judgments that impose their view of the law on other States and bind the rights of the residents of those States." § 2, 119 Stat. at 5.

22.     In passing the Act, Congress explicitly stated that one of its purposes was to "restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction." *Id.*

23.     Plaintiffs present a case of "national importance" that belongs in federal court. The class they purport to represent consists of "thousands of members...located throughout the United States" who received NASD or NYSE arbitration awards over a period of more than six years. (Cplt. ¶¶ 25, 26.) Their claims concern representations made during commercial arbitrations administered by national securities organizations that regulate thousands of brokerage firms that buy and sell securities on national markets. The strong connections to interstate commerce are inescapable. *See, e.g., Prudential Sec. Inc. v. Hornsby*, 865 F. Supp. 447, 449 (N.D. Ill. 1994) ("It is axiomatic that the purchase and sale of securities relates to interstate commerce.").

24.     For all of these reasons, federal diversity jurisdiction over Plaintiffs' class action is proper under 28 U.S.C. § 1332(d). This Court has original jurisdiction over this action under 28 U.S.C. §§ 1332, 1441(a), 1441(b), and 1453(b), and this action is removable to this Court.

25.     Because this action is now pending against Defendant in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, venue is proper in the Southern District of Florida, Miami Division.

26.     This Notice of Removal is timely under 28 U.S.C. § 1446(b), as it has been filed less than thirty days since the filing of this action and service upon the Defendant. It is also appropriate under 28 U.S.C. § 1453(b), which provides that "[a] class action may be removed to a district court of the United States in accordance with section 1446...without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants." *Id.*

27.     Written notice of this filing will be provided to all adverse parties, and a

copy of this Notice of Removal will be filed in the appropriate State court, as required by 28

U.S.C. § 1446(d).

28.     In filing this Notice of Removal, Defendants do not waive any defenses

that may be available to them.

WHEREFORE, the above described action now pending against Defendant in the

Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, is properly

removed to this Court.

Respectfully submitted,

HOLLAND & KNIGHT LLP
701 Brickell Avenue
Suite 3000
Miami, Florida 33131
Tel: (305) 374-8500
Fax: (305) 789-7799

By: _____
Tracy A. Nichols
Fla. Bar No. 454567
E-mail: tnichols@hklaw.com

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Richard A. Rosen
E-mail: rrosen@paulweiss.com
*Pro Hac Vice Motion Pending*
Marc Falcone
E-mail: mfalcone@paulweiss.com
*Pro Hac Vice Motion Pending*
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendant*

Doc #:NY6:972543.4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Removal was sent via

U.S. mail this 24th day of May, 2005 to: Darren C. Blum, Blum Silver & Schwartz, LLP, 12540 W.

Atlantic Blvd., Coral Springs, FL 33071.

By: _____
Tracy Nichols

# 2221092_v1

# EXHIBIT A

**CT CORPORATION**
A Wolters Kluwer Company

**Service of Process**
**Transmittal**
05/05/2005
Log Number 510187487

TO:  Mel Klusky
Morgan Stanley DW Law Division
2000 Westchester Avenue
Purchase, NY, 10577

RE:  **Process Served in Florida**

FOR:  Morgan Stanley DW Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Robert Quintana & Aline M. Quintana, On behalf of themselves and all others similarly situated, Pltfs. Vs Morgan Stanley DW, Inc., Dft. Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Exhibits |
| **COURT/AGENCY:** | Miami-Dade County Circuit Court, FL, Miami-Dade, FL Case # 05-8636-CA-13 |
| **NATURE OF ACTION:** | Class Action - Failure to properly comply with discovery obligations in arbitration proceedings despite representations in numerous arbitration actions that all documents had been produced, including e-mails, etc. - Seeking damages of approximately $100,000,000.00 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 05/05/2005 at 12:30 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days |
| **ATTORNEY(S) / SENDER(S):** | Darren C. Blum Blum, Silver & Schwartz, LLP 12540 W. Atlantic Blvd. Coral Springs, FL, 33071 954-255-8181 |
| **ACTION ITEMS:** | Telephone, Mel Klusky , 914-225 5829 SOP Papers with Transmittal, via Fed Ex 2 Day, 791063223612 SOP Papers with Transmittal, via Fax, Mel Klusky 212-507-5859. SOP Papers with Transmittal, via Fax, Kevin McCarthy 914-225-6154 Papers faxed to Mr. McCarthy per instructions of Mel Klusky Email Notification, Mel Klusky mel.klusky@morganstanley.com Email Notification, Clare Powanda clare.powanda@morganstanley.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Donna Moch |
| **ADDRESS:** | 1200 South Pine Island Road Plantation, FL, 33324 |
| **TELEPHONE:** | 954-473-5503 |

Page 1 of 1 / TB

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action.

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.

ROBERT QUINTANA & ALINA M. QUINTANA,                    **05 - 08838  CA 13**
On behalf of themselves and all others similarly situated,


        PLAINTIFFS,

vs.

MORGAN STANLEY DW, INC.,


        DEFENDANT.
_____/

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

        YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this
action on the registered agent for the Defendant, Morgan Stanley, DW, Inc.,

MORGAN STANLEY DW, INC.
By serving its registered agent:
CT CORPORATION SYSTEM
1200 S. Pine Island Road
Plantation, FL 33324

        Defendant, Morgan Stanley, DW, Inc., is required to serve written defenses to the
Complaint on Blum, Silver & Schwartz, LLP, Plaintiffs' attorneys, whose address is 12540 W.
Atlantic Blvd., Coral Springs, FL 33071, within 20 days after service of this summons on that
Defendant, exclusive of the day of service, and to file of the original of the defenses with the
clerk of this court either before service on Plaintiffs' attorneys or immediately thereafter. If a
Defendant fails to do so, a default will be entered against that Defendant for the relief demanded
in the Complaint.

DATED on _____

HARVEY RUVIN
As Clerk of the Court

By:_____CALEBRA SUTTON_____
As Deputy Clerk

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO. **05 08838 CA 13**

ROBERT QUINTANA & ALINA M. QUINTANA,
On behalf of themselves and all others similarly situated,

PLAINTIFFS,

vs.

MORGAN STANLEY DW, INC.,

DEFENDANT.

_____/

**CLASS REPRESENTATION**

THE ORIGINAL FILED

ON APR 2 9 2005

IN THE OFFICE OF
CIRCUIT COURT DADE CO. FL
CIVIL DIVISION

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, ROBERT QUINTANA and ALINA M. QUINTANA, by their undersigned attorneys, individually and on behalf of all others similarly situated in the class described below, upon actual knowledge with respect to the allegations relating to Plaintiffs' claims for misconduct against Defendant MORGAN STANLEY DW, INC. (hereafter, referred to as "Morgan Stanley" or "Defendant"), based upon, inter alia, the investigation by Plaintiffs' counsel, which included, among other things, a review of public statements made by Defendant and their employees, Securities Exchange Commission ("SEC") filings, National Association of Securities Dealers, Inc. ("NASD") filings, Court Orders, Arbitration Orders, press releases, media reports, and written communications by Defendant's outside counsel, bring this Class Action Complaint against Morgan Stanley and allege as follows:

## NATURE OF THE ACTION

1.      This is a Class Action brought by the Plaintiffs against Morgan Stanley, on behalf of the Class which is defined as individuals or entities who filed arbitration claims against Morgan Stanley before the NASD or the New York Stock Exchange ("NYSE") and received an

Arbitration Award between January 1, 1999 through April 21, 2005 (the "Class"). Plaintiffs seek to recover damages caused to the Class by Defendant based upon breach of contract, negligence, and breach of fiduciary duty.

2. Pursuant to Morgan Stanley's standard brokerage account agreement, Morgan Stanley agreed to arbitrate any and all disputes, claims or controversies brought by members of the Class in accordance with the rules of the NASD or NYSE arbitration departments and under applicable laws and regulations. In connection with such arbitration proceedings, Morgan Stanley agreed to, or was ordered to, produce records, including e-mails, relating to the Class member's and their respective brokerage accounts at issue.

3. Defendant is subject to stringent SEC rules on recordkeeping documents related to its business practices. Federal regulation also requires e-mails to be maintained for 3 years and readily accessible for 2 years. See 17 C.F.R. §240.17 a-4 (1997). Defendant is also subject to NASD Rules of Conduct with regard to its business practices related to the retention of correspondence.

4. This action arises as a result of an admission by the Defendant that it did not properly comply with discovery obligations in arbitration proceedings despite its representations in numerous arbitration actions that all documents had been produced, including e-mails. In fact, Morgan Stanley sent a letter to the Plaintiffs, as well as other members of the Class who have pending arbitrations or have had decisions rendered already, stating that it has located additional sources which it is reviewing that may lead to the discovery of additional responsive documents that were not originally produced in the aforementioned arbitration proceedings. See correspondence dated April 21, 2005 from Greenberg Traurig, P.A. to Plaintiffs annexed hereto as Exhibit "1." A similar letter was sent out to many Class members.

5. In actuality, Morgan Stanley has discovered over a thousand back-up tapes which contain e-mails and attachments which were not searched for purposes of discovery compliance.

6.      Just recently, the state of New Hampshire noted in a press release related to Morgan Stanley that:

> **"What we have seen is a consistent pattern of delay and obfuscation relating to document production in addition to inadequate record keeping, both here in New Hampshire, and in other jurisdictions...Morgan Stanley appears to have developed a pattern in its dealings with federal and state regulators which if not reversed, can only contribute to the erosion of confidence among clients and stockholders alike."**

See Press Release dated April 7, 2005 annexed hereto as Exhibit "2."

If Morgan Stanley will not cooperate and produce documents to the States and regulators, it is easy to imagine how much they abused the discovery process in NASD and NYSE Arbitrations.

7.      Moreover, Morgan Stanley has long been on notice that its e-mail retention system was corrupt. On or about December 3, 2002, Morgan Stanley paid a $1.65 million fine to the SEC for failing to preserve e-mail communications and or to maintain them in an accessible place. See SEC News Digest dated December 3, 2002 annexed hereto as Exhibit "3."

8.      Recently, due to a closely watched Florida Circuit court action in Palm Beach County relating to a lawsuit filed by Coleman Holdings, Inc., a company owned and controlled by Ronald Perelman, against Morgan Stanley, Morgan Stanley's intentional misconduct came to light in which Morgan Stanley was caught red-handed flagrantly violating its discovery obligations regarding the review and production of e-mails and their attachments. The Hon. Elizabeth Maass entered a scathing 15 page Order detailing the misconduct by Morgan Stanley. Judge Maass found:

> **"Throughout this entire process, MS & Co. and its counsels' lack of candor has frustrated the Court and opposing counsel's ability to be fully and timely informed...MS& Co.'s failure to time notify CPH of the existence of the DLT and 8-mm tapes, which it had located as early as 2002 and certainly prior to the June 23, 2004 certification, and its failure to timely process those raw backup tapes was willful and a gross abuse of its**

discovery obligations."

<u>See</u> Order of Hon. Elizabeth Maass dated March 1, 2005 annexed hereto as Exhibit "4."

9.    Morgan Stanley's intentional withholding of documents in arbitration has been recognized by the NASD and several arbitration panels.  In or about August 2004, the NASD sanctioned Morgan Stanley $250,000.00 for failing to comply with discovery obligations in arbitration.  <u>See</u> NASD Disciplinary Actions August 2004 annexed hereto as Exhibit "5."  The NASD's action was a direct response to multiple arbitration panels sanctioning Morgan Stanley for discovery violations.  For example, in <u>Farnsworth v. Morgan Stanley DW, Inc.</u>, NASD Case No. 02-07298, the arbitration panel sanctioned Morgan Stanley $10,000.00 per day for failing to produce discovery.  <u>See</u> Order annexed hereto as Exhibit "6."

10.    Morgan Stanley's actions demonstrate a history of discovery abuse preventing Plaintiffs from obtaining a full and fair hearing.  Morgan Stanley has abused the arbitration process for years, and has violated the discovery rules repeatedly.

11.    Recently, a group of former Morgan Stanley executives and shareholders have recognized Defendant's failure to act properly and have launched a campaign to obtain Morgan Stanley CEO, Philip Purcell's, resignation and for further changes to the corporate culture of Morgan Stanley for, amongst other reasons, Morgan Stanley's handling of litigation and regulatory matters.  <u>See</u> letter of shareholders dated March 31, 2005 annexed hereto as Exhibit "7."

12.    Throughout the Class period, Morgan Stanley represented that it was in compliance with its discovery obligations when, in reality, it was intentionally withholding discoverable material and knew or should have known that other documents were not produced.

13.    As demonstrated herein, Morgan Stanley's failure to abide by its discovery obligations and to produce to Plaintiffs specific discovery documents, has resulted in unfair arbitration awards to Class members.

4

14.     As a result of Morgan Stanley's misconduct, the Class is entitled to all of the "newly" discovered documents; the vacatur of any arbitration award procured by fraud, misrepresentation or other misconduct; the right to new arbitration hearings; and damages, including, but not limited to, a return of all forum fees assessed by and paid to the NASD or NYSE pursuant to said arbitration awards.

15.     The total amount in controversy as to the Plaintiffs and each individual member of the proposed Class alleged herein exceeds fifteen thousand dollars ($15,000.00).

## PARTIES

16.     Plaintiffs, Robert and Alina Quintana ("Quintana"), were clients of Morgan Stanley.

17.     Between 1999 and 2005, Morgan Stanley, doing business throughout the United States, was one of the largest securities firms in the world as measured by profits, revenue and employees. However, Morgan Stanley was also the subject of thousands of customer complaints that resulted in the filing of arbitration claims by customers relating to the mishandling of their brokerage accounts.

## BACKGROUND

18.     On or about April 4, 2003, Quintana filed an arbitration action before the NASD entitled Robert Quintana and Alina Quintana v. Morgan Stanley Dean Witter (the "Arbitration").[1] The matter was assigned NASD Case No. 03-02562. Quintana was required to file their arbitration action before the NASD pursuant to their Morgan Stanley Brokerage Account Agreement which contained an arbitration clause. During the course of the Arbitration, Quintana requested that Morgan Stanley produce records relating to their accounts, including all correspondence, memos, e-mails or other documents.

---

[1] Morgan Stanley Dean Witter is now known as Morgan Stanley DW, Inc.

19.     Morgan Stanley represented to Quintana and the Arbitration Panel, at various times, that any and all documents, including e-mails, responsive to Quintana's document requests were searched for and produced.

20.     During the course of the Arbitration, Morgan Stanley made a significant issue about the Quintana's use of their computer, including e-mail exchange and the use of the Internet. After lengthy arguments, Morgan Stanley was permitted to take possession of the Quintana's computer and have it examined by an independent forensic expert, which they did.

21.     During the arbitration proceedings, Morgan Stanley failed to timely produce certain documents. Ultimately, the merits of the dispute were presented to a 3 member arbitration panel over a 4 day period in June 2004. At the conclusion of the Final Hearings, the Arbitration Panel sanctioned Morgan Stanley for its failure to timely produce documents.[2] See Quintana Arbitration Award annexed hereto as Exhibit "8."

22.     Notwithstanding the fact that the Arbitration Award resolved all of the issues, including attorney's fees, Morgan Stanley filed a separate and frivolous lawsuit against Quintana which is currently pending in Miami-Dade Circuit Court to recover its attorney's fees.

23.     On April 21, 2005, counsel for Morgan Stanley admitted to Quintana's counsel that there were sources containing information, including e-mails, that were not retrieved or searched during the prosecution of the Arbitration. See Exhibit "1."

24.     Morgan Stanley and its principals, agents, employees and attorneys were involved in not producing the documents, and/or disseminating the materially false and misleading statements and information alleged herein. Morgan Stanley and its principals, agents, employees and attorneys were provided with copies of the document requests and had the ability and/or opportunity to prevent the issuance of the false statements.

---

[2] Unfortunately, the Panel only awarded $400.00 in sanctions and no other compensatory damages.

## CLASS REPRESENTATION ALLEGATIONS

25.    Plaintiffs bring this action as a Class Action. The Class is defined as follows:  All

non-affiliated individuals or entities who received an Arbitration Award in any arbitration forum,

i.e. NASD, NYSE, etc., between January 1, 1999 through April 21, 2005, whereby Morgan

Stanley was a named Respondent.

26.    Members of the Class are so numerous that joining of all members is impractical.

While the exact number of Class members is unknown to Plaintiffs at this time, this information

can be ascertained through appropriate discovery.  Plaintiffs believe that there are thousands of

members of the Class located throughout the United States.  Members of the Class may be

identified from records maintained by the Defendant, NASD or NYSE, and may be notified of

the filing of this action by mail or other forms of publication, using forms of notice similar to

those customarily used in Class Actions.

27.    Plaintiffs' claims are typical of the claims of the other members of the Class.

Plaintiffs and the other members of the Class, by virtue of them receiving an Arbitration Award

during the Class period, have sustained damages as a result of Defendant's unlawful or improper

activities as alleged herein.

28.    Plaintiffs have retained counsel competent and experienced in Class Actions and

securities litigation and intend to prosecute this action vigorously.  The interest of the Class will

be fairly and adequately protected by Plaintiffs.  Plaintiffs have no interest which is contrary to

or in conflict with that of the Class, which Plaintiffs seek to represent.

29.    This case meets the requirements of Florida Rules of Civil Procedure;

specifically, Rule 1.220.  This Class is maintainable under either Rule 1.220(b)(1)(A) or under

Rule 1.220(b)(3).    A Class Action is superior to all other available methods for the fair and

efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in

the management of this action that would preclude its maintenance as a Class Action.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class include, but are not limited to, the following:

i.      Whether the Defendant breached the contract between itself and members of the Class.

ii.     Whether Defendant's actions of not producing documents, and not searching for documents during the course of Class member's arbitrations was negligent.

iii.    Whether the Defendant violated its fiduciary duty to its customers as alleged herein.

iv.     Whether Defendant knew or should have known of the location of the documents, including e-mails, which it failed to produce.

v.      Whether Defendant withheld the documents with the express intention of gaining an unfair advantage in the Class member's arbitrations.

vi.     Whether Defendant omitted material facts or failed to state their true knowledge regarding the location of the documents.

vii.    Whether Defendant participated directly or indirectly in the course of conduct complained of herein.

viii.   Whether members of the Class have sustained damages as a result of Defendant's conduct, and the proper measure of such damages.

## COUNT I
## BREACH OF CONTRACT

31.     Plaintiffs re-allege and incorporate by reference paragraphs "1" through "30," as if set forth more fully herein.

32.     Defendant entered into written customer agreements with Plaintiffs and other members of the Class.

8

33.     Pursuant to the written customer agreements, Defendant agreed that it would comply with the rules and regulations of the NASD, the NYSE, the SEC, State securities laws and the rules and regulations promulgated thereunder.

34.     Specifically, as an NASD member, Defendant agreed to comply with rules and regulations of that self-regulatory organization, including the NASD Code of Arbitration Procedure.

35.     Defendant breached its written customer agreement by failing to comply with the rules and regulations of the NASD, NYSE, the SEC and all rules and regulations promulgated thereby.

36.     As a direct and proximate result of Defendant's misconduct, Plaintiffs have suffered substantial damages.

WHEREFORE, Plaintiffs, Robert Quintana and Alina M. Quintana, individually and on behalf of the Class, demand an award against Defendant for compensatory damages of approximately $100,000,000.00, plus interest, costs, attorney's fees, punitive damages and for such other relief as the Court deems just and proper.

## COUNT II
### NEGLIGENCE

37.     Plaintiffs re-allege and incorporate by reference paragraphs "1" through "30," as if fully set forth more fully herein.

38.     In connection with the Plaintiffs' arbitration claim, Defendant owed a duty to act in accordance with, and consistent with, the standard of care exercised by others similarly situated.

39.     Defendant breached the duty of care owed to Plaintiffs by engaging in the conduct set forth above without regard to Plaintiffs' rights.

40.     Defendant was negligent in failing to produce e-mails and any attachments in

9

accordance with discovery obligations.

    41.   The negligence of Defendant consisted of, among other things:

        a. Failing to exercise due care;

        b. Failing to act in the best interest of Plaintiffs;

        c. Failing to refrain from putting its own interests above the interests of Plaintiffs;

        d. Failing to deal fairly with Plaintiffs;

        e. Failing to disclose all material information to Plaintiffs;

        f. Failing to refrain from making false statements;

        g. Failing to comply with those provisions of its contracts with the NASD or the NYSE that were intended to benefit the Plaintiffs;

        h. Failing to comply with all of the covenants and implied covenants and written contracts with Plaintiffs;

        i. Failing to act in accordance with the customs, usages and industry standards of the securities industry including, but not limited to the NASD Code of Arbitration Procedure;

    42.   As a result of Defendant's negligence, Plaintiffs have suffered substantial damages.

    WHEREFORE, Plaintiffs, Robert Quintana and Alina M. Quintana, individually and on behalf of the Class, demand an award against Defendant for compensatory damages of approximately $100,000,000.00, plus interest, costs, attorney's fees, punitive damages and for such other relief as the Court deems just and proper.

## COUNT III
## BREACH OF FIDUCIARY DUTY

43.     Plaintiffs re-allege and incorporate by reference paragraphs "1" through "30," as if set forth more fully herein.

44.     Based on the relationship between Plaintiffs and Defendant, Defendant owed a duty of care and loyalty to Plaintiffs, its customer.

45.     Defendant had a duty to act in the highest good faith toward its customers.

46.     Defendant breached its fiduciary duty to Plaintiffs by making misrepresentations and omissions of material fact to conceal Defendant's wrongdoing with regard to the discovery of documents in arbitration.

47.     By reason of its relationship with Plaintiffs, and as a result of the assurances set forth above to arbitrate in good faith and in accordance with regulations and the law, Defendant owed Plaintiffs a fiduciary duty to, among other things:

    a. produce all documents it promised to produce;

    b. to immediately disclose missing documents;

    c. to deal fairly with Plaintiffs;

    d. to disclose all material information to Plaintiffs;

    e. to refrain from making false statements or creating misimpressions regarding discovery obligations; and

    f. to comply with all covenants and implied covenants contained in its contracts with its customers.

48.     Defendant breached the aforesaid fiduciary duties owed to Plaintiffs.

49.     As a result of the foregoing, Plaintiffs have suffered substantial damages.

WHEREFORE, Plaintiffs, Robert Quintana and Alina M. Quintana, individually and on behalf of the Class, demand an award against Defendant for compensatory damages of

11

approximately $100,000,000.00, plus interest, costs, attorney's fees, punitive damages and for

such other relief as the Court deems just and proper.

BLUM, SILVER & SCHWARTZ, LLP
Attorneys for Plaintiffs
12540 W. Atlantic Blvd.
Coral Springs, Florida 33071
Telephone: (954) 255-8181
Facsimile: (954) 255-8175

By: _____        Date: __4/29/05__

DARREN C. BLUM
Fla. Bar No. 087173
SCOTT L. SILVER
Fla. Bar No. 95631
WAYNE H. SCHWARTZ
Fla. Bar No. 907390

# Greenberg Traurig

TODD A. ZUCKERBROD, ESQ.
DIRECT DIAL: (561) 650-7905
E-Mail Address: *zuckerbrodt@gtlaw.com*

RECEIVED
APR 2 5 2005
BY:

April 21, 2005

*VIA FACSIMILE (954) 255-8175 & U.S. MAIL*

Wayne Schwartz, Esq.
BLUM, SILVER & SCHWARTZ, LLP
12540 West Atlantic Boulevard
Coral Springs, FL 33071

Re:   *Robert and Alina Quintana JT TEN vs. Morgan Stanley Dean Witter*
      *NASD-DR Arbitration No. 03-02562*

Dear Mr. Schwartz:

We are writing to advise you that, to the extent it has agreed or is otherwise obligated to produce email in this matter, Morgan Stanley DW Inc. ("MSDW") has recently come to appreciate that there are additional sources that might contain additional responsive email. These additional sources, however, are not actively used for information retrieval and are not readily searchable. MSDW is attempting to enable the email from those sources to be searched. It will take an as-yet-unknown period of time to determine if there is email or other electronic data from those sources that is responsive to discovery obligations in this matter and not previously produced from other sources. MSDW will advise you as to its progress. Although there may or may not be material responsive in this matter, MSDW will make reasonable accommodations as appropriate.

Very truly yours,



Todd A. Zuckerbrod

TAZ/cj

WPB-FS1\538893v0114/20/05\39657.010000

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
WILMINGTON
ZURICH

www.gtlaw.com

# The State of New Hampshire



**Mailing Address**
State House Room 204
Concord, New Hampshire 03301-4989
Telephone (603) 271-1463
Facsimile (603) 271-7933

**Location**
State House Annex
25 Capitol St.
Concord, New Hampshire 03301

### Department of State
### Bureau of Securities Regulation

**FOR IMMEDIATE RELEASE**

**CONTACT:** Scott Kirby
Communications Director
603-271-6837

## N.H. SECURITIES BUREAU REACHES SETTLEMENT WITH MORGAN STANLEY FOR $435,000

**Concord, N.H. ( April 7, 2005)** - The New Hampshire Bureau of Securities Regulation announced today its year- long investigation into improper sales and business practices of Morgan Stanley has culminated in a $435,000 settlement with the New York based-firm. Mark Connolly, Bureau Director, said the Bureau's case primarily focused on the company's improper use of sales incentives, inadequate response to document requests, and lack of appropriate oversight of company agents.

In its consent agreement, the Bureau cites Morgan Stanley for carrying out sales campaigns in New Hampshire that focused on promoting certain proprietary funds, while offering compensation schemes that are not permissible under state and federal securities laws. One campaign was termed "Steak-a-thon," whereby over 100 steaks were awarded to agents located in New Hampshire branches based on sales of certain Morgan Stanley proprietary mutual funds. The Bureau further contends that the company attempted to shield the focus on Morgan Stanley products from the public as much as possible. Deputy Director and lead enforcement attorney, Jeffrey Spill, referred to a number of e-mails from company management to employees urging them to refrain from referring to the contests.

### -MORE-

New Hampshire Bureau of Securities Regulation
April 7, 2005
Page 2 of 2

The agreement also cites Morgan Stanley for improper and inadequate production of documents. "The company failed to produce requested documentation to the Bureau on several occasions," said Spill. "What we have seen is a consistent pattern of delay and obfuscation relating to document production in addition to inadequate record keeping, both here in New Hampshire, and in other jurisdictions. In fact, in a recent circuit court decision in the state of Florida, *Coleman Holding Inc. v. Morgan Stanley*, the company was cited for withholding the production of e-mails."

The Bureau further asserts that a Morgan Stanley agent solicited New Hampshire customers to purchase shares of four companies at a time when the shares were neither suitable for those clients, nor registered under the New Hampshire Uniform Securities Act. The Agent also engaged in trading in his own account and purchased shares of stocks that had been restricted by the company. The Agent's trading was excessive and not in compliance with company policy.

In addition to the $425,000 administrative fine to be paid to the State of New Hampshire, the company will pay $10,000 to the Bureau for the cost of the investigation. Morgan Stanley must also retain an independent consultant to review compliance and policy procedures and may be required to provide rescission to some clients in the coming months.

"This company needs to take a serious look at questionable patterns and certain business practices," said Bureau Director Connolly. "Morgan Stanley appears to have developed a pattern in its dealings with federal and state regulators which if not reversed, can only contribute to the erosion of confidence among clients and stockholders alike."

-END-

Westlaw.

SECDIG 2002-232-1                                                                Page 1

SECDIG 2002-232-1, 2002 WL 31692225 (S.E.C.)

(Cite as: 2002 WL 31692225 (S.E.C.))

*1 SEC, NYSE, NASD FINE FIVE FIRMS TOTAL OF $8.25 MILLION FOR FAILURE TO
PRESERVE E-MAIL COMMUNICATIONS
SEC News Digest 2002-232
Enforcement Proceedings
December 3, 2002

The Securities and Exchange Commission, the New York Stock Exchange and NASD
today announced joint actions against five broker-dealers for violations of
record-keeping requirements concerning e-mail communications. The firms consented
to the imposition of fines totaling $8.25 million, along with a requirement to
review their procedures to ensure compliance with record-keeping statutes and
rules.

Each of the firms - Deutsche Bank Securities Inc.; Goldman, Sachs & Co.; Morgan
Stanley & Co. Incorporated; Salomon Smith Barney Inc.; and U.S. Bancorp Piper
Jaffray Inc. - consented, without admitting or denying the allegations, to
findings that each:
   • Violated Section 17(a) of the Securities Exchange Act of 1934, Rule 17a-4
under the Exchange Act, NYSE Rule 440 and NASD Rule 3110 by failing to preserve
for a period of three years, and/or preserve in an accessible place for two years,
electronic communications relating to the business of the firm, including
interoffice memoranda and communications.
   • Violated NYSE Rule 342 and NASD Rule 3010 by failing to establish, maintain
and enforce a supervisory system to assure compliance with NASD and NYSE rules and
the federal securities laws relating to retention of electronic communications.

The firms agreed to a penalty of a censure and fines totaling $8.25 million -
$1.65 million per firm - to be paid to the U.S. Treasury, NYSE and NASD. The firms
also agreed to review their procedures regarding the preservation of e-mail
communications for compliance with federal securities laws and the rules of the
NYSE and NASD. Each firm agreed to inform each regulator, in writing, within 90
days that it has established systems and procedures reasonably designed to achieve
compliance with the statute and rules relating to e-mail retention.

Background

The respondents' failure to preserve e-mail communications and\or to maintain
them in an accessible place was discovered during investigations being conducted
jointly and separately by the SEC, NYSE and NASD.

Some firms backed up e-mail communications on tape or other media that was
represented as part of a process designed as a disaster-recovery or
business-continuity measure, or for another business purpose. However, these firms

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SECDIG 2002-232-1                                                    Page 2

SECDIG 2002-232-1, 2002 WL 31692225 (S.E.C.)

(Cite as: 2002 WL 31692225 (S.E.C.))

discarded or recycled and overwrote their back-up tapes and other media, often a
year or less after back-up occurred.

   Each firm had inadequate procedures and systems to retain and make accessible
e-mail communications. While some firms relied on employees to preserve copies of
the e-mail communications on the hard drives of their individual personal
computers, there were no systems or procedures to ensure that employees did so.

   In those instances in which the firms did retain e-mail communications, those
communications were often stored in an unorganized fashion on back-up tapes, other
media, or on the hard drives of computers used by individual employees. In some
instances, hard drives of computers preserving electronic mail communications were
erased when individuals left the employment of the firm.

   *2 Although each firm had an obligation to preserve e-mail communications
pursuant to Section 17(a) of the Exchange Act and Rule 17a-4 thereunder, NYSE Rule
440, and NASD Rule 3110, during all or part of 'the period from 1999 to at least
2001, each of the firms failed to preserve for three years, and/or to preserve in
an accessible place for two years, electronic communications (including
interoffice memoranda and communications) that related to its business as a member
of an exchange, broker or dealer. (Rel. 34-46937; File No. 3-10957; Press Rel.
2002-173)

Securities and Exchange Commission (S.E.C.)

   SECDIG 2002-232-1, 2002 WL 31692225 (S.E.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT, IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO.: 502003CA005045XXOCAI

COLEMAN (PARENT) HOLDINGS, INC.,
        Plaintiff,

vs.

MORGAN STANLEY & CO., INC.,
        Defendant.

_____/

## ORDER ON COLEMAN (PARENT) HOLDINGS, INC.'S MOTION FOR ADVERSE INFERENCE INSTRUCTION DUE TO MORGAN STANLEY'S DESTRUCTIONS OF E-MAILS AND MORGAN STANLEY'S NONCOMPLIANCE WITH THE COURT'S APRIL 16, 2004 AGREED ORDER, AND MOTION FOR ADDITIONAL RELIEF AND ORDER ON PLAINTIFF'S MOTION TO COMPEL FURTHER DISCOVERY REGARDING MORGAN STANLEY'S DESTRUCTION AND NON-PRODUCTION OF E-MAILS

THIS CAUSE came before the Court on February 14, 2005 on Coleman (Parent) Holdings,

Inc.'s ("CPH's") Motion for Adverse Inference Instruction Due to Morgan Stanley's Destruction of

E-Mails and Morgan Stanley's Noncompliance with the Court's April 16, 2004 Agreed Order, as

modified by CPH's February 14, 2005 ore tenus motion for additional relief, and on February 28,

2005 on Plaintiff's Motion to Compel Further Discovery Regarding Morgan Stanley's Destruction

and Non-Production of E-Mails, with both counsel present. Based on evidence introduced, the Court

finds:

    1.    CPH has sued Defendant, Morgan Stanley & Co., Inc. ("MS & Co."), for fraud in

connection with CPH's sale of its stock in Coleman, Inc., to Sunbeam Corporation in return for

Sunbeam stock.  Whether MS & Co. had  knowledge of the fraudulent scheme undertaken by

Sunbeam in 1997 and early 1998 and, if so, the extent of that knowledge, is central to the case. CPH

has sought access to MS & Co.'s internal files, including e-mails, since the case was filed.

2.      Though MS & Co. instructed its investment bankers to preserve paper documents in their possession in connection with the Sunbeam transaction in February, 1999, it continued its practice of overwriting e-mails after 12 months, despite an SEC regulation requiring all e-mails be retained in readily accessible form for two years. *See* 17 C.F.R. §240.17a-4 (1997).

3.      On April 16, 2004, the Court entered its Agreed Order requiring MS & Co. to (1) search the oldest full backup tape for each of 36 MS & Co. employees involved in the Sunbeam transaction; (2) review e-mails dated from February 15, 1998 through April 15, 1998 and e-mails containing any of 29 specified search terms such as "Sunbeam" and "Coleman", regardless of their date; (3) produce by May 14, 2004 all nonprivileged e-mails responsive to CPH's document requests; (4) give CPH a privilege log; and (5) certify its full compliance with the Agreed Order.

4.      On May 14, 2004, MS & Co. produced approximately 1,300 pages of e-mails but failed to provide the required certification. Finally, on June 23, 2004, after inquiries by CPH, MS & Co. provided CPH with a certificate of full compliance with the April 16 Agreed Order signed by Arthur Riel, the MS & Co. manager assigned this task.

5.      As organized by MS & Co., the effort to recover e-mails from any remaining backup tapes had several stages. First, the relevant backup tapes (in various formats, such as "DLT" tapes and eight-millimeter tapes) had to be located by searching the potential storage locations. Second, the tapes were sent to an outside vendor, National Data Conversion, Inc. ("NDC"), to be processed, and the data returned to MS & Co. in the form of "SDLT" tapes. Third, MS & Co. had to find a way to upload the contents of these SDLT tapes into its new e-mail archive. Fourth, MS & Co. would run "scripts" to transform this data into a searchable form, so that it could later be searched for responsive e-mails. MS & Co. personnel used the term "staging area" to describe the stage of the

process when SDLT tapes remained in limbo, waiting to be uploaded to the archive.

6.     At some point prior to May 6, 2004, Arthur Riel and his team became aware that more than 1,000 backup tapes had been found at a MS & Co. facility in Brooklyn, New York. These 1,423 DLT tapes had not been processed by NDCI and thus had not been included in the archive or searched when MS & Co. made its supposedly complete production on May 14, 2004, and when Mr. Riel certified full compliance with the Agreed Order on June 23, 2004. Aware of the tapes' discovery, Mr. Riel knew when he executed the certification that it was false. He and others on MS & Co.'s e-mail archive team knew by July 2, 2004 that these "Brooklyn tapes" contained e-mail dating back at least to the late 1990's. MS & Co. neither withdrew its certification nor informed CPH about the potential for additional production of e-mails, however. During the summer of 2004, the Brooklyn tapes were processed and sent to the staging area, but they were not uploaded to the e-mail archive so as to be available to be searched until January 2004, at least eight months after they were found.

7.     MS & Co. also failed to timely produce e-mails from 738 8-millimeter backup tapes found at a MS & Co. facility in Manhattan, in 2002. These 738 8-mm tapes, like the 1,423 Brooklyn tapes, had not been processed by NDCI and thus had not been included in the archive and searched when MS & Co. made its supposedly complete production on May 14, 2004, and when Mr. Riel certified full compliance with the Agreed Order on June 23, 2004. Mr. Riel and others were told by their vendor, NDCI, by July 2, 2004 that the 8-mm tapes contained e-mail dating back at least to 1998. MS & Co. neither withdrew its certification nor informed CPH about the potential for additional production of e-mails, though. During the summer of 2004, the 8-mm tapes were processed and sent to the staging area. Like the Brooklyn tapes, though, they also were not uploaded

to MS & Co.'s e-mail archive.

8.  In August 2004, Mr. Riel was relieved of his employment responsibilities. He and his team were replaced by a new team headed by Allison Gorman Nachtigal.

9.  Ms. Gorman testified that she was instructed to describe the circumstances of Mr. Riel's replacement as his having been "placed on administrative leave." That same term appears by interlineation over the original typed description in MS & Co.'s memorandum addressing these issues. The typed language stated: "[Mr. Riel was] dismissed for integrity issues." MS & Co. presented no evidence to explain why Mr. Riel would have been placed on administrative leave rather than terminated. CPH argued that it may have been to deprive CPH of the ability to contact him directly.

10.  Upon taking over Mr. Riel's responsibilities, Ms. Gorman did not initially make significant efforts to address the backlog of data in the staging area; indeed, she was not informed of the existence of this litigation until five months later, in January 2005. In October 2004, Ms. Gorman met with a group of MS & Co. attorneys. Following that meeting, Ms. Gorman gave the project somewhat greater priority, although even then it clearly did not move as expeditiously as possible. For example, MS & Co. gave no thought to using an outside contractor to expedite the process of completing the discovery, though it had certified completion months earlier; it lacked the technological capacity to upload and search the data at that time, and would not attain that capacity for months; and it knew trial was scheduled to begin in February, 2005. Even at this point, no one from MS & Co. or its outside counsel, Kirkland & Ellis LLP, gave CPH or this Court any hint that the June certification was false.

11.  On November 17, 2004, more than six months after the May 14, 2004 deadline for

4

producing e-mails in response to the Agreed Order, MS & Co. sent CPH a letter revealing that its

June 23 certificate of compliance was incorrect. The letter stated:

> Morgan Stanley has discovered additional e-mail backup tapes
> since our e-mail production in May 2004. The data on some of
> [the] newly discovered tapes has been restored and, to ensure
> continued compliance with the agreed order, we have re-run the
> searches described in the order. Some responsive e-mails have
> been located as a result of that process. We will produce the
> responsive documents to you as soon as the production is finalized.

The letter also foreshadowed further delays: "(s)ome of the backup tapes are still being restored. To

ensure continued compliance with the agreed order, we intend to re-run the searches again when the

restoration process is complete and will produce any responsive documents that result."

      12.    The next day, November 18, 2004, MS & Co. produced an additional 8,000 pages of

e-mails and attachments. MS & Co.'s November 2004 letter stated that the 8,000 pages came from

"newly discovered" tapes; but the testimony now makes clear that this statement was false because

Ms. Gorman's team did not figure out how to upload and make searchable the materials from the

staging area until January, 2005.

      13.    MS & Co. has failed to offer any explanation to reconcile the obvious conflict

between its assertions at the time of production that the 8,000 pages came from "newly discovered"

tapes (i.e., the "Brooklyn tapes") and the testimony of its own witness, Ms. Gorman, that data from

those newly discovered tapes were not capable of being searched until two months later, in January.

      14.    After a follow-up inquiry by CPH, on December 17, 2004, MS & Co. produced a

privilege log and told CPH that "[n]o additional responsive e-mails have been located since our

November production." MS & Co. refused to answer CPH's questions about whether MS & Co.

had restored all the backup tapes described in its November 17 letter and why the tapes had not been located earlier, however.

15.    On December 30, 2004, CPH sought confirmation that MS & Co. had reviewed all e-mail backup tapes and produced all responsive e-mails and, if not, asked when the review would be completed. On January 11, 2005, MS & Co. informed CPH that the "restoration of e-mail back tapes is ongoing. Restoration of the next set of backup tapes is estimated to be completed at the end of January. We intend to re-run the searches described in the agreed order at that time."

16.    On January 19, 2004, CPH wrote asking MS & Co. to explain the circumstances under which MS & Co. located the "newly discovered" backup tapes and to disclose when the tapes were located. CPH also asked MS & Co. to explain why the backup tapes could not be restored sooner.

17.    On January 21, 2005, MS & Co. sent CPH a letter that failed to answer CPH's questions. Instead, MS & Co. described its efforts to restore the backup tapes as "ongoing"; informed CPH that "there is no way for MS & Co. to know or accurately predict the type or time period of data that might be recovered"; and stated that MS & Co. "cannot accurately estimate when all of the tapes will be restored or whether any recoverable data will be found on the remaining tapes."

18.    On January 26, 2005, CPH filed the Motion at issue here, asking the Court to instruct the jury that MS & Co.'s destruction of e-mails and other electronic documents and MS. & Co.'s noncompliance with the April 16, 2004 Agreed Order can give rise to an adverse inference that the contents of the missing e-mails would be harmful to MS & Co.'s defense in this case.

19.    Meanwhile, MS & Co. found another 169 DLT tapes in January, 2005, that allegedly

6

had been misplaced by its New Jersey storage vendor, Recall. Again, MS & Co., chose to provide no specifics to CPH or to the Court.

20.    At a February 2, 2005 hearing on CPH's Motion, Thomas A. Clare of Kirkland & Ellis, LLP, representing MS & Co., stated that "late October of 2004...[is] the date I represent to Court is the first time that anyone knew that there was recoverable e-mail data" on the Brooklyn tapes. Hr'g Tr. (2/2/05) at 133-34. The actual date, however, was at least three months earlier, by July 2, 2004. Furthermore, MS & Co. refused to provide the Court with definitive answers about when its e-mail production would be complete, merely stating that it would proceed with "all deliberate speed." *Id.* at 139. Also at the February 2 hearing, Mr. Clare neglected to inform the Court about the 8-mm tapes that had been located in 2002, and told the Court that the 1,423 DLT tapes had been found in Brooklyn "sometime during the summer" of 2004.    The truth of this assertion is belied by the evidence showing that the tapes were found before May 6, 2004.

21.    On February 3, 2005, the Court ordered further discovery and set an evidentiary hearing for February 14, 2005. The discovery took place on February 9 and 10, when CPH deposed the three e-mail witnesses identified by MS. & Co.

22.    On Saturday afternoon, February 12, 2005, MS & Co. informed the Court that it had, in the previous 24 hours, discovered additional tapes. Also, MS & Co. stated that its recent production omitted certain "attachments" to e-mails. MS & Co. did not attempt to clarify or substantiate either of these statements to CPH or to the Court until the Monday, February 14, 2005 hearing.

23.    At the February 14 hearing, none of the witnesses MS & Co. presented was involved in or familiar with the actual electronic searches conducted using the parameters specified in this

7

Court's April 16, 2004 Agreed Order, and none explained where the 8,000 pages produced in November, 2004 had come from. MS & Co.'s witnesses did, however, describe three new developments. First, Robert Saunders, a Morgan Stanley executive director in the Information Technology Division, testified that he returned to New York after his February 10 deposition and, concerned about his unqualified assertion that the was "confident" that a complete search for backup tapes had been conducted, decided finally to undertake a personal search of MS & Co.'s "communication rooms," going to the areas he thought most obvious first. By doing so, he and two contractors discovered more than 200 additional backup tapes openly stored in locations known to be used for tape storage. Those discoveries were made on Friday and Saturday, February 11 and 12, 2005. As of the February 14 hearing, NDCI had not yet determined which, if any, of these newly discovered backup tapes contained e-mails. Second, Ms. Gorman reported that on Friday, February 11, 2005 she and her team had discovered that a flaw in the software they had written had prevented MS & Co. from locating all responsive e-mail attachments. Third, Ms. Gorman reported that MS & Co. discovered on Sunday evening, February 13, 2005, that the date-range searches for e-mail users who had a Lotus Notes platform were flawed, so there were at least 7,000 additional e-mail messages that appeared to fall within the scope of the Agreed Order had yet to be fully reviewed by MS. & Co.'s outside counsel for responsiveness and privilege. As counsel for MS & Co. admitted, this problem "dwarf[s]" their previous problems. Hr'g Tr. (2/14/05) at 13. Ms. Gorman indicated she was "90 percent sure" that the problem infected MS & Co.'s original searches in May, which means that even they failed to timely produce relevant materials that had been uploaded into the archive by that point. *Id.* at 82-83. The bulk of the employees using the Lotus Notes platform in the relevant time period came from the Investment Banking Division, the division responsible for the

8

transaction under review here.

24.    On February 19, 2005 MS & Co. informed counsel for CPH that "additional boxes of back up tapes" have been located "in a security room" and that, "(a)s of this morning, Morgan Stanley has identified four (unlabled) DLT tapes among the collection. Those four tapes will be sent to NDCI for further analysis." The disclosure did not state when the discovery was made. MS & Co.'s counsel represented to the Court that it was his understanding that about 73 bankers' boxes of tapes were discovered. No explanation for the late discovery was offered.

25.    Throughout this entire process, MS & Co. and its counsels' lack of candor has frustrated the Court and opposing counsel's ability to be fully and timely informed.

26.    MS & Co.'s failure during the summer and fall of 2004 to timely process a substantial amount of data that was languishing in the "staging area," rather than being put into searchable form and then searched, was willful and a gross abuse of its discovery obligations.

27.    MS & Co.'s failure to time notify CPH of the existence of the DLT and 8-mm tapes, which it had located as early as 2002 and certainly prior to the June 23, 2004 certification, and its failure to timely process those raw backup tapes was willful and a gross abuse of its discovery obligations.

28.    MS & Co.'s failure to produce all e-mail attachments was negligent, and it was discovered and revealed only as a result of CPH's hiring a third-party vendor, pursuant to the Court's February 4, 2005 Order, to double-check MS & Co.'s compliance with the April 16, 2004 Agreed Order.

29.    MS & Co.'s failure to produce all of the Lotus Notes e-mails was negligent, and it was discovered and revealed only as result of CPH's hiring a third-party vendor, pursuant to the

9

Court's February 4, 2005 Order, to double-check MS & Co.'s compliance with the April 16, 2004 Agreed Order.

30.    MS & Co.'s failure to locate other potentially responsive backup tapes before Saturday, February 12, 2005 was grossly negligent.

31.    Given the history of the discovery, there is no way to know if all potentially responsive backup tapes have been located.

32.    In sum, despite MS & Co.'s affirmative duty arising out of the litigation to produce its e-mails, and contrary to federal law requiring it to preserve the e-mails, MS & Co. failed to preserve many e-mails and failed to produce all e-mails required by the Agreed Order. The failings include overwriting e-mails after 12 months; failing to conduct proper searches for tapes that may contain e-mails; providing a certificate of compliance known to be false when made and only recently withdrawn; failing to timely notify CPH when additional tapes were located; failing to use reasonable efforts to search the newly discovered tapes; failing to timely process and search data held in the staging area or notify CPH of the deficiency; failing to write software scripts consistent with the Agreed Order; and discovering the deficiencies only after CPH was given the opportunity to check MS & Co.'s work and the MS & Co.'s attorneys were required to certify the completeness of the prior searches. Many of these failings were done knowingly, deliberately, and in bad faith.

It is clear that e-mails existed which were requested by CPH that have not been produced because of the deficiencies discussed above.    Electronic data are the modern-day equivalent of the paper trail. Indeed, because of the informalities of e-mail, correspondents may be less guarded than with paper correspondence. In this case, the paper trail is critical to CPH's ability to make out its prima facie case. Thus, MS & Co.'s acts have severely hindered CPH's ability to

10

proceed. The only way to test the potentially self-serving testimony of MS & Co. personnel is with the written record of the events.

The failures outlined in this Order are of two types. First, by overwriting e-mails contrary to its legal obligation to maintain them in readily accessible form for two years and with knowledge that legal action was threatened, MS & Co. has spoiled evidence, justifying sanctions. See Martino v. Wal-Mart Stores, Inc., 835 So. 2d 1251 (Fla. 4th DCA 2003). "The appropriateness of sanctions for failing to preserve evidence depends on: (1) willfulness or bad faith of the responsible party, (2) the extent of prejudice suffered by the other party, and (3) what is required to cure the prejudice." Nationwide Lift Trucks, Inc. v. Smith, 832 So. 2d 824, 826 (Fla. 4th DCA 2002). Second, MS & Co.'s willfull disobedience of the Agreed Order justifies sanctions. See Rule 1.380 (b) (2), Fla. R. Civ. P. The conclusion is inescapable that MS & Co. sought to thwart discovery *in this specific case.*

Sanctions in this context are not meant to be punitive. They are intended, though, to level the playing field.

A reasonable juror could conclude that evidence of MS & Co.'s misconduct demonstrates its consciousness of guilty. It is relevant to the issues before the jury. Further, CPH should not be penalized by being forced to divert the jurors' attention away from the merits of its claim to focus on highly technical facts going to MS & Co.'s failures here, facts that are not reasonably disputed. Evidence of that failure, though, alone does not make CPH whole. Indeed, it can be said it is not a "sanction" at all, but merely a statement of unrefuted facts that the jury may find relevant. Shifting the burden of proof, though, forces MS & Co. to accept the practical consequence of its failures–that some information will never be known. Obviously, this sanction is of consequence only in the

11

marginal case. If there is overwhelming proof of MS & Co.'s knowledge of the fraud and collusion with Sunbeam, CPH would have prevailed on those elements in any event. And, to the contrary, if there is overwhelming evidence MS & Co. did not know of the fraud or conspire with or aid Sunbeam in its commission, it would have prevailed in any event. If the case is close on those issues, though, MS & Co., not CPH, should bear the burden of persuasion. Further, shifting the burden on the fraud issue does not relieve CPH of its obligation to establish the other elements of its claims, most notably reliance, proof of which is independent of the MS & Co. e-mails. Thus, the sanctions chosen are the most conservative available to the Court to address the spoilation of evidence and willfull violation of the Agreed Order.[1][2]

Finally, the Court notes that CPH has requested the e-mails since May of 2003. MS & Co. was supposed to comply with the April 16, 2004 Order by May 14, 2004. Fact discovery in this case closed November 24, 2004. MS & Co.'s actions have resulted in the diversion of enormous amounts of resources, by both the parties and the Court, into a fact discovery dispute that should have never arisen and which would have long ago been put to bed had MS & Co. timely recognized its obligations to CPH and this Court. Opening argument in this complex case is set for March 21,

---

[1]MS & Co.'s bad acts and pocket book may not be used to gain the continuance it has sought from the beginning. Further, the Court has no confidence that, even if a continuance were granted, MS & Co. would fully comply with discovery in this case.

[2]The undersigned notes that the sanctions imposed are not enumerated in Rule 1.380 (b) (2), and is aware of the concern expressed in the 2000 Handbook on Discovery Practice, Joint Committee of the Trial Lawyers Section of the Florida Bar and Conferences of Circuit and County Court Judges ("(f)or the trial court to be on solid footing, it is wise to stay within the enumerated orders" [Handbook at p. 4]). However, MS & Co.'s violations involve both the violation of a discovery order and the intentional spoiliation of evidence. The sanction imposed is *less* severe than that provided in Rule 1.380 (b) (2) (B), under which the Court could preclude MS & Co. from presenting evidence of its lack of knowledge of or collusion with the Sunbeam fraud, which the Court finds is the least severe enumerated sanction appropriate to place the parties on a level playing field.

12

2005. Preliminary jury selection has begun. MS & Co. has controlled the timetable of this portion of the litigation long enough. Consequently, CPH should have the ability to continue to require MS & Co. to attempt to comply with the Agreed Order and the February 4, 2005 Order on Coleman (Parent) Holdings Inc.'s ore tenus Motion to Participate in Search of Additional E-Mail Back Up Tapes or Appoint Third Party to Conduct Search, or to elect to terminate the e-mail discovery and concentrate on trial preparation.

Based on the foregoing, it is

ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Adverse Interference Instruction Due to Morgan Stanley's Destructions of E-Mails and Morgan Stanley's Non-Compliance with the Court's April 16, 2004 Agreed Order and Motion for Additional Relief is GRANTED.

2. MS & Co. shall continue to use its best efforts to comply with the April 16, 2004 Agreed Order and shall continue to comply with the February 4, 2005 Order on Coleman (Parent) Holdings Inc.'s ore tenus Motion to Participate in Search of Additional E-Mail Back Up Tapes or Appoint Third Party to Conduct Search until March 21, 2005 or written notice from CPH, which ever first occurs. Either party shall notify the other in writing of its intention to offer into evidence e-mails actually produced to CPH prior to termination of e-mail discovery in conformity with this Order, within 72 hours of the e-mail's production to CPH. The Court shall hear and determine any objections to use of the e-mails.

3. The Court shall read to the jury the statement of facts attached as Exhibit A during whatever evidentiary phase of CPH's case that it requests. These findings of fact shall be conclusive. See Rule 1.380 (b) (2) (A). No instruction shall be given to the jury regarding inferences to be drawn from these facts. However, counsel may make such argument to the jury in favor of whatever inferences that evidence may support. No other evidence concerning the production of e-mails, or

13

lack thereof, shall be presented absent further Court order.

    4.     CPH will be allowed to argue that MS & Co.'s concealment of its role in the

Sunbeam transaction is evidence of its malice or evil intent, going to the issue of punitive damages.

See, e.g., General Motors Corp. v. McGee, 837 So.2d 10120.

    5.     MS & Co. shall bear the burden of proving to the jury, by the greater weight of the

evidence, that it lacked knowledge of the Sunbeam fraud and did not aid and abet or conspire with

Sunbeam to defraud MS & Co. The traditional order of proof shall remain unaffected, however.

    6.     MS & Co. shall compensate CPH for costs and fees associated with the Motion. The

amount shall be determined at an evidentiary hearing to be held after the completion of the trial.

    7.     Plaintiff's Motion to Compel Further Discovery Regarding Morgan Stanley's

Destruction and Non-Production of E-Mails is Denied.

    DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this ⎽⎽ day
of March, 2005.

ELIZABETH T. MAASS
Circuit Court Judge

copies furnished to:
Joseph Ianno, Jr., Esq.
222 Lakeview Ave., Ste. 1400
West Palm Beach, FL 33401

Thomas D. Yannucci
655 - 15th Street, NW, Ste. 1200
Washington, DC 20005

John Scarola, Esq.
2139 Palm Beach Lakes Blvd.
West Palm Beach, FL 33409

14

Jerold S. Solovy, Esq.
One IBM Plaza, Ave., Ste. 4400
Chicago, IL 60611

Rebecca Beynon, Esq.
Sumner Square
1615 M Street, NW. Suite 400
Washington, DC 20036

## EXHIBIT A

A federal regulation in effect in 1997 and all times since required Morgan Stanley to preserve e-mails for three years and to preserve them in a readily accessible place for two years. Beginning in no later than 1997, Morgan Stanley had a practice of overwriting e-mails after 12 months. E-mails could no longer be retrieved once they were overwritten. This practice was discontinued in January, 2001. CPH has sought access to Morgan Stanley's e-mails relating to this transaction since the case was filed in May, 2003.

Prior to 2003, Morgan Stanley recorded e-mails and other electronic data on back up tapes. On April 16, 2004, the Court ordered Morgan Stanley to (1) search the oldest full backup tape for each of 36 Morgan Stanley employees involved in the Sunbeam transaction; (2) review e-mails dated from February 15, 1998 through April 15, 1998 and e-mails containing any of 29 specified search terms such as "Sunbeam" and "Coleman", regardless of their date; (3) produce by May 14, 2004 all e-mails relating to this case found by the search I have just described; and (4) certify its full compliance with the Court's order.

On May 14, 2004, Morgan Stanley produced approximately 1,300 pages of e-mails. It did not produce the required certification. On June 23, 2004, after inquiries by CPH, Morgan Stanley provided CPH with a certificate of full compliance with the April 16 Order signed by Arthur Riel, the Morgan Stanley manager assigned this task.

As organized by Morgan Stanley, the effort to recover e-mails from the backup tapes had several stages. First, the relevant backup tapes had to be located by searching the potential storage locations. Second, the tapes were sent to an outside vendor, National Data Conversion, Inc., which I will call "NDCI", to be processed, and the data returned to Morgan Stanley. Third, Morgan Stanley had to upload the processed data into its e-mail archive. Fourth, Morgan Stanley had to run scripts, or pieces of computer code, to transform this data into a searchable form. Finally, Morgan Stanley had to search the data for e-mails related to this case. Morgan Stanley personnel used the term "staging area" to describe the stage of the process when the processed data returned by NDCI remained in limbo, waiting to be uploaded to Morgan Stanley's archive.

At some point prior to May 6, 2004, Arthur Riel and his team became aware that 1,423 backup tapes had been found at a Morgan Stanley facility in Brooklyn, New York. These 1,423 tapes had not been processed by NDCI and thus had not been included in the archive or searched when Morgan Stanley made its production to CPH on May 14, 2004. Aware of the tapes' discovery, Mr. Riel knew when he executed the certification of full compliance with the Court's April 16, 2004 Order that it was false. He and others on Morgan Stanley's e-mail archive team knew by July 2, 2004 that these "Brooklyn tapes" contained e-mail dating back at least to the late 1990's. During the summer of 2004, the Brooklyn tapes were processed and the data sent to the staging area. The scripts were not written and tested to permit the search for e-mails relating to this case to begin until the middle of January, 2004. Such a search, even if perfectly done, can take weeks.

Morgan Stanley also failed to timely produce e-mails from 738 backup tapes found at a Morgan Stanley facility in Manhattan in 2002. These 738 tapes, like the 1,423 Brooklyn tapes, had not been processed by NDCI and thus had not been included in the archive and searched by either on May 14, 2004 or June 23, 2004. Mr. Riel and others were told by NDCI by July 2, 2004 that these tapes contained e-mail dating back at least to 1998. During the summer of 2004, the these tapes were processed and sent to the staging area. Like the Brooklyn tapes, though, they also were not searched.

In August 2004, Mr. Riel was relieved of his employment responsibilities. He and his team were replaced by a new team headed by Allison Gorman Nachtigal. At that time, the staging area contained about 600 gigabytes of e-mail data that had not yet been uploaded into the Morgan Stanley archive and had not been searched for e-mails relating to this case.

Upon taking over Mr. Riel's responsibilities, Ms. Gorman did not initially make significant efforts to address the backlog of data in the staging area. Indeed, she was not informed of the existence of this litigation until five months later, in January 2005. In October 2004, Ms. Gorman gave the project somewhat greater priority, although even then it did not move as expeditiously as possible. Morgan Stanley did not consider using an outside contractor to expedite the process.

Morgan Stanley found another 169 DLT tapes in January, 2005, that had been misplaced

by its New Jersey storage vendor. Morgan Stanley discovered more than 200 additional backup tapes openly stored in locations known to be used for tape storage on February 11 and 12, 2005. On February 11, 2005 Morgan Stanley discovered that a flaw in the software it had written had prevented Morgan Stanley from locating all e-mail attachments about the Sunbeam transaction. Morgan Stanley discovered on February 13, 2005, that the date-range searches for e-mail users who had a Lotus Notes platform were flawed, so that additional e-mail messages that appeared to fall within the scope of the April 16, 2004 Order had not been given to CPH. Further, it appears that the problem infected Morgan Stanley's original searches in May of 2004. The bulk of the employees using the Lotus Notes platform in the relevant time period came from the Investment Banking Division, the division responsible for the transaction under review here. On February 16, 2005, Morgan Stanley withdrew its certificate of compliance with the April 16, 2004 Order. On February 19, 2005 Morgan Stanley notified CPH that it had found boxes of additional tapes that have not been uploaded into its archive or searched for responsive e-mails. Morgan Stanley did not tell CPH it had found any tapes that it had not searched until November 17, 2004. Even then, it did not tell CPH how many tapes were found, when they were found, or when they would be searched. MS & Co. did not provide all of this information to CPH until February of 2005. The searches had not yet been completed when this trial was begun, when they were terminated without completion.

(see NASD Investor Alert—Brokerage Firm Private Securities Offerings: Buying Your Brokerage at www.nasd.com/investor/Alerts/bdos.htm).

Under NASD rules, the individuals and firms named in a complaint can file a response and request a hearing before an NASD disciplinary panel. Possible sanctions include a fine, an order to pay restitution, censure, suspension, or bar from the securities industry.

### NASD Fines Citigroup, Merrill Lynch, and Morgan Stanley a Total of $750,000 for Failing to Comply with Discovery Obligations in Arbitrations

NASD censured and fined Citigroup Global Markets, Inc., formerly Salomon Smith Barney; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Morgan Stanley DW Inc. $250,000 each for failing to comply with their discovery obligations in 20 arbitration cases during the period 2002 through 2004.

All three firms must also implement written procedures designed to ensure that future discovery violations that lead to sanctions are elevated to senior officers for review and appropriate corrective action.

"NASD is committed to making our arbitration forum faster, fairer, and less expensive than court procedures," said Robert Glauber, NASD Chairman and CEO. "We cannot deliver on this commitment if firms fail to produce all required documents in a timely manner to opposing parties. We will not tolerate any failure by NASD-regulated firms to cooperate fully in the arbitration process and we will bring enforcement actions as necessary to assure full compliance with our arbitration code."

These cases arise from arbitrations conducted before NASD Dispute Resolution, Inc. arbitration panels as well as arbitration panels sponsored by other regulatory forums. Citigroup was a party in six of the arbitrations. Merrill Lynch and Morgan Stanley were parties in seven arbitrations each.

In these arbitrations, arbitration panels cited the firms for failing to produce documents to the claimants, as required by rules involving document discovery. After finding in each of the arbitrations that the firms failed to fully comply with their discovery obligations to produce documents—even after arbitration panels had issued orders compelling their production—the panels sanctioned the firms in amounts as high as $52,000.

As recently as last year, NASD formally reminded firms that "NASD rules require parties to NASD arbitrations to cooperate in the voluntary exchange of documents and information, and to respond to discovery requests from other parties" in a timely manner. NASD's Notice to Members 03-70 pointed out that it had become clear that "despite the guidance provided in the

Code and the Discovery Guide, NASD continues to receive complaints regarding possible abuses of the discovery process."

The Notice further stated that "some parties believe that noncompliance with their duty to cooperate in the discovery process—to voluntarily turn over documents listed on applicable Document Production Lists, or requested by other parties under Rule 10321—is a routine and acceptable part of arbitration strategy."

In the cases announced today, NASD found that by failing to comply with their discovery obligations, each of the firms violated NASD's rule requiring that securities firms adhere to just and equitable principles of trade. NASD also found that in arbitrations conducted before NASD Dispute Resolution, each of the firms violated NASD's Code of Arbitration Procedure, which provides that a failure to produce any document pursuant to the provisions of the Code is deemed a violation of the just and equitable principles of trade.

As part of today's settlements, each firm has agreed to establish a written procedure requiring review, at the management level of the firm, of any instance where an arbitration panel has sanctioned the firm for discovery violations and of instances where the firm is required to produce documents in response to a motion to compel filed in an arbitration. Each firm also agreed to notify all counsel handling arbitration proceedings on its behalf of the firm's policy to comply with discovery requirements in arbitration proceedings.

Citigroup, Merrill Lynch, and Morgan Stanley agreed to the sanctions while neither admitting nor denying the allegations.

### NASD Fines Piper Jaffray $2.4 Million for IPO Spinning

#### Corporate Executives Favored in Bid for Investment Banking Business

NASD censured and fined Piper Jaffray & Co. $2.4 million for engaging in improper spinning of hot initial public offerings (IPOs). Piper Jaffray violated NASD rules by allocating and selling profitable hot IPOs to executives of corporations from which Piper Jaffray was seeking, or had obtained, investment banking business.

During 1999 through 2001, Piper Jaffray improperly allocated and sold shares of these hot IPOs to 22 corporate executives, primarily CEOs and CFOs of public companies. None of these executives did any personal business with Piper Jaffray during the relevant period. The only activity in each executive's account was the purchase and sale of hot IPO shares. Each individual was a key executive officer (or spouse) of an existing or potential Piper Jaffray investment banking client and was in a position to

BEFORE THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
("NASD") – DISPUTE RESOLUTION ("DR")

In the Matter of the Arbitration between

ESTHER FARNSWORTH,                              )
                                                )
                            Claimant,           )
                                                )
vs.                                             )         NASD-DR ARBITRATION
                                                )         #02-07298
                                                )
                                                )
MORGAN STANLEY DW, INC.,                        )
                                                )
                            Respondent.         )

## ORDER #4 OF THE ARBITRATION PANEL ("Panel")

Introduction. This Order #4 of the Arbitration Panel ("Panel") deals with certain ongoing

discovery disputes. Further, in part, this Order memorializes and confirms agreements between the

Parties and the Chairperson, and in certain instances, contains Directives issued by the Chairperson

or the Panel. Also, this Order contains results from a Telephonic Conference conducted on Monday,

October 6, 2003, between the Parties' respective Counsel and the Chairperson, and another

Telephonic Conference between such Counsel and all Panel Members on Monday, October 13, 2003.

Background. As noted above, recently, Telephonic Conferences have been conducted, trying

to resolve discovery disputes and to obtain compliance with the Panel's Orders, including, but not

limited to, Order #2 Entered on August 7, 2003, and Order #3 Entered on September 22, 2003.

Previously, the Panel's Chairperson interacted extensively with the Parties' Counsel concerning

discovery and compliance issues. In such regard, it is estimated the Chairperson has now heard approximately 5 hours of Oral Arguments, explanation/further explanation, etc. from the Parties' respective Counsel concerning such issues. Likewise, as this Order's numbering, itself, reflects, this is not the first Order Entered herein concerning ongoing and seemingly, never-ending discovery disputes, but rather, the latest in a series.

October 6, 2003 Telephonic Conference with the Chairperson. On October 6, 2003, the Parties' Counsel and the Chairperson conducted an approximately three-hour Telephonic Conference. During such Conference, the Parties' Counsel and the Chairperson discussed, reviewed, re-reviewed, and analyzed the Parties' respective discovery-requests in exacting detail. For example, the Chairperson and the Parties' Counsel reviewed Respondent's September 15, 2003 Motion to Compel ("Motion to Compel") concerning its (Respondent's) March 17, 2003 11-page First Request for Production of Documents and Information ("Respondent's First Request") (containing some 64 separate Requests), and Claimant's April 17, 2003 Responses and Objections thereto, literally on item-by-item Request-basis. Additionally, the Chairperson heard Oral Arguments concerning Claimant's September 23, 2003 Reply to Morgan Stanley's Motion to Compel, including Claimant's assertions that Respondent's Motion to Compel was untimely; the Chairperson OVERRULED Claimant's objections concerning timeliness. (For the sake of brevity, this Order will not recite the agreements reached, nor the Chairperson's respective Ruling, on each of the 64 separate Requests in Respondent's First Request; rather, the Parties CONFIRMED to the Chairperson each fully understood the agreements and her Rulings. Additionally, the Chairperson made rather extensive notes concerning same, which notes she will maintain.)

2

Telephone Records. Furthermore, concerning Respondent's First Request, Request #'s 37, 38,

and 39, the Chairperson was concerned to learn there was a mutual lack to exchange of relevant

telephone records and telephone numbers.  Claimant was ORDERED to PRODUCE documents

responsive to Respondent's Requests #37, 38, and 39, but such Requests were LIMITED and

MODIFIED to the general discovery time-frame agreed-to by the Parties, i.e., three years (3) prior to

account- opening, and one (1) year after account-transfer from Respondent.  Additionally, upon

learning Respondent, itself, had not produced any responsive telephone records concerning

telephone calls to Claimant and/or others' acting on Claimant's behalf, the Chairperson ORDERED

Respondent to likewise provide responsive records, as such had been requested quite some time ago

by Claimant in discovery. .

Claimant's Motion for Award of Sanctions ("Claimant's Sanction Motion") Pursuant to NASD

Code of the Arbitration Procedure, Rule 10321, and NASD NTM 99-90, Claimant filed a Sanction

Motion against Respondent, alleging Respondent failed to comply with the Panel's Order #2.  During

this Telephonic Conference, the Chairperson heard Oral Arguments whether Respondent violated

Order #2, and if so, whether such violation(s) was/were willful and knowing.  The Chairperson was

PARTICULARLY CONCERNED with Respondent's assertions it misunderstood the scope of Claimant's

underlying Request concerning prospectuses and other marketing materials for the mutual funds

Claimant was sold (items Respondent had agreed to produce), and also with Respondent's failure to

offer any certification that no (0) such material exists.  NASD Rules, as well as common sense,

dictate that if no (0) responsive document exists, then a party should state this fact; so doing

prevents misunderstandings, saves Counsel's, as well as the Panel's, time, and so forth.  Respondent

FAILED to produce such document(s) after being Ordered by Order #2, ¶2 to so produce them; if no

3

(0) such document(s) existed, then, IN THE ALTERNATIVE, this Panel FINDS Respondent failed to

comply with the Rules requiring such statement to be supplied. (This is not the first time Respondent

has been recently-Ordered by a Hearing Panel to "so specifically state" if it "does not have any

documents responsive to a discovery request." Please see *Palko's et al v. Morgan Stanley,* NASD

Docket #02-02481, February 25, 2003 Order, p. 6, ¶ I.)


Similarly, while Respondent's Counsel admitted he regularly produced yearly financial–advisor

commission total's, the financial advisor's compensation detail–report herein had "not yet been

provided". (Please see Order #2, ¶2 re: Respondent's being Ordered to produce all responsive

documents it had agreed to furnish). Furthermore, if no (0) such documentation existed, then,

again, Respondent provided no (0) certification to such effect.


Likewise, no (0) payout grid nor other compensation documentation had been produced, nor

did Respondent offer any certification that no (0) such document(s) existed. (Please again see Order

#2, ¶2). All of these documents were Ordered to have been produced by Respondents on or before

August 12, 2003. The Panel FINDS Respondent VIOLATED such Order. Further, the Panel FINDS the

rationale(s) tendered for noncompliance was/were INSUFFICIENT, and/or in certain instances, NO

(0) RATIONALE was proffered.


Confidentiality Stipulation. The Chairperson inquired about the status of Confidentiality

Stipulation the Parties were required execute pursuant to Order #3. Claimant's Counsel indicated he

had signed such Confidentiality Stipulation and tendered it to Respondent's Counsel for execution;

however, despite the passage of one (1) week, Claimant's Counsel had not received such

4

Confidentiality Stipulation back, nor had he received any explanation why. Respondent's Counsel

responded he could not execute such Confidentiality Stipulation due to ¶2(b) of such Stipulation;

Respondent's Counsel felt ¶2(b) required him to certify certain information he could not, in good

faith, so certify. (* It was and remains MOST TROUBLING to this Panel that Respondent did not, of

its own volition, bring such matter immediately to this Panel's attention, but rather, allowed further

delay. To this Panel, it was and is questionable "good faith" to allow such to continue for that length

of time without any action whatsoever. Additionally, the underlying documents sought under the

Confidentiality Stipulation were not furnished by Respondent with a watermarking of "Confidential",

subject to the Panel's later resolving this issue concerning Respondent's "problems" with ¶2(b).

Rather, no (0) responsive documents were furnished Claimant.) Thus, despite Order #3, the passage

of the time, and despite Respondent's ability to obviously petition the Panel (as evidenced by the

Respondent's filing, for example, its Motion to Compel, Responses, and the like) - - despite all of

such, no (0) action was taken by Respondent concerning same vis-à-vis the Panel. The Panel's

Chairperson was presented with yet-another, and unexpected, discovery and compliance problem.

Resolution by Chairperson concerning Confidentiality Stipulation. First and foremost, let it be

perfectly understood—No (0) Party may act in bad faith concerning a Panel's Order. When

confronted with Respondent's Counsel's assertion he could not act in good faith and execute the

Confidentiality Stipulation, the foregoing sentence was in essence shared with him. However, in an

effort to resolve such, assuring no attorney had to ostensibly act in bad faith, and also endeavoring

to expedite these matters, the Chairperson allowed the Confidentiality Stipulation (adopted pursuant

to Order #3) to be AMENDED in ¶2(b) by insertion of the additional words: "To the best of my

knowledge, and after reasonable due diligence". With such additional proviso, Respondent's Counsel

affirmed he could: execute the Confidentiality Stipulation upon completion of his reasonable due diligence, return same to Claimant's Counsel, and also provide the underlying responsive documents. Not wishing this matter of Respondent's compliance/noncompliance to continue further, Respondent was GRANTED UNTIL FRIDAY, October 10, 2003 to complete all due diligence under the Confidentiality-Stipulation's proviso, and by such date, to have fully and faithfully performed and complied with Order #3.

October 13, 2003 Telephonic Conference.  To continue to monitor the status of Respondent's compliance/noncompliance, the Chairperson set yet-another Conference Call, the next one being Monday, October 13, 2003 at 10:00 A.M.  Because she wished and expected to share "good news" (quote/unquote) about compliance with her fellow Panel Members or Respondent's Counsel could explain and show-cause why not, she INSTRUCTED Respondent's Counsel to utilize the entire intervening time  to get the Confidentiality Stipulation (as amended with the proviso) executed, and the underlying responsive documents (about which the Confidentiality Stipulated pertained) provided -- all pursuant to Panel Order #3.

During the October 13 Telephonic Conference with the full Panel and the Parties' respective Counsel, regrettably, despite the even-further passage of time, Respondent's Counsel reported that, as of such date, the Confidentiality Stipulation (with the amendatory proviso) had not been executed as required by Order #3.  Respondent's Counsel further reported, as his due diligence, he had tried to contact Respondent's Director of Compliance three (3) times during the preceding week; but, despite all these calls, Respondent's Counsel had received no (0) response whatsoever thereto from such Director of Compliance.  Additionally, and continuing, despite the Panel's Order, Respondent's

6

Counsel reported he had not provided Claimant with the: MAPS Supervisory Manual; Accounts

Supervisory Manual; the Compliance Department Procedures Manual; any updates and bulletins; nor

any successor Manual(s) thereto for all of the foregoing (All of the documents referenced in this

paragraph are collectively referred to as "Manuals"). Thus, the bottom line was, despite the Order,

the Confidentiality Stipulation (with the amendatory proviso, the alleged lack of which was the

alleged reason for the "original" noncompliance) was still not signed; similarly, the so-Ordered-

produced responsive documents were still not produced.

Yet-Another Conference Call. Not unsurprisingly, the Chairperson set yet-another Conference

Call in this matter, for yet one (1) week in the future, the same time, same day- - just a week later.

In the interim, Respondent was ORDERED to provide a copy of all such Manuals (even if such be

stamped "Confidential" with watermarking) to Claimant's Counsel FORTHWITH.  In no (0) way,

shape, nor form is such a substitute for compliance with the plain, simple, and very straight-forward

language of the underlying Orders of the Panel herein, which Orders have been amply reviewed, re-

reviewed, re-re-reviewed, etc. with the Parties, including Respondent's Counsel.  Rather, such

partially is a "piece-meal" approach to remediate the harm(s) which Claimant and Claimant's case

may or will suffer due to the lack of such documents and due to Respondent's noncompliance with

this Panel's Orders.

Additional Findings.  In addition to the Findings contained herein *supra*, among other

provisions, pursuant to Rule 10324, this Panel specifically and directly ALSO FINDS as follows:

1.      Respondent fully understood the Orders of this Panel.  If and when Respondent

        asserted an arguable rationale why it could not comply with an Order (such as when

7

its Counsel stated he could not act in good faith on a matter), then this Panel promptly modified such Order by adding a proviso to the Confidentiality Stipulation. Yet, thereafter, despite the addition of such proviso, Respondent <u>still</u> failed and/or refused to timely comply with this Panel's Orders;

2.  Respondent has had full, and fair, if not excessive, time and opportunities to comply with Orders #2 and #3 of this Panel;

3.  Despite: the provisions of 10321; Claimant's efforts as outlined in Claimant's pleadings herein, some of which efforts are admitted by Respondent's Counsel; the Chairperson's efforts: the provisions of NASD Rules and the Canons of Ethics requiring cooperation between the Parties and cooperation with this Panel; the passage of sufficient time to comply and/or resolve any compliance issues, including sufficient time to file and initiate Panel-proceedings herein to resolve any question(s) and/or issue(s) about compliance - - despite all of the foregoing, Respondent knowingly and willfully disobeyed this Panel's Orders #2 and #3;

4.  Despite, in essence, being given one final, "last-chance" to report compliance to the entire Panel or show-cause why not, Respondent did not show sufficient cause to excuse it noncompliance. It is regrettable Respondent's Director of Compliance did not return any of Respondent Counsel's three (3) telephone calls within a week; however, under the facts and circumstances herein, such surely is not sufficient cause for noncompliance with the Panel's Orders nor sufficient cause to avert the imposition of sanctions on Respondent;

5.  At this juncture, the Panel does not wish to preclude nor impair Respondent's case-presentation, defenses, and evidence (although Respondent conduct herein has, or

8

could have, impaired Claimant's case, if this Panel would allow such noncompliance with its Orders to continue); and

6.        Having exhausted all other avenues trying to obtain Respondent's compliance, the Panel has no further nor reasonable option or alternative remaining which would ensure fairness, preserve the integrity of this process and this Panel, and would insure compliance with its Orders except to issue and award sanctions.

Issuance and Award of Sanctions, and Taxing. Considering all of the foregoing, the Panel GRANTS Claimant's Sanction Motion.

Further, the Panel ISSUES and AWARDS SANCTIONS against Respondent in the following regards:

A.        Three Thousand Dollars ($3,000) AWARDED to Claimant from Respondent as a sanction;

B.        Beginning October 21, 2003, and continuing for each calendar day thereafter, a SANCTION of Ten Thousand Dollars ($10,000) per day payable to NASD by Respondent, until Respondent shall have fully and faithfully complied with all the Orders of this Panel.  For such $10,000 per-day sanction to cease, and/or to be deemed non-applicable, a Representative of Respondent must CERTIFY IN WRITING to the Panel that Respondent has fully and faithfully complied with all Orders herein. Respondent's so-Certifying Representative is ADVISED that, of course, the Panel shall rely on such Certification.  (As this sanction is per-day,

9

including therein all calendar days, the Parties and their respective

Counsel are notified of the Chairperson's availability throughout — be it

later at night, on week-ends, holidays, etc.— to receive and review such

Certification.); and

C.    All NASD's costs concerning this Order #4, and all preceding Motions and

Conference Calls thereto, shall be, and the same hereby are, TAXED and

ASSESSED to Respondent.

<u>Certain Procedural Matters Briefly Explained</u>. As is the Chairperson's professional and

personal rule, she discussed last among the Panel Members, voted last among the Panel

Members, etc. In such regard, it could be perceived by her fellow Panel Members as rude and

discourteous for her to do otherwise, and the Chairperson verily believes to do otherwise

would indeed be rude and discourteous. This Order #4 was finalized by the Chairperson after

the Panel had decided all pending matters, including most-specific details. The Chairperson

undertakes extraordinary lengths to assure her Fellow Panelists participate equally and fully,

and to so do before she ever discusses or votes on whatever issue is pending at-Arbitration.

Regrettably, but factually, because, for example, Orders are often signed by the Chairperson

solely, sometimes internal Panel procedural-matters may not be known, or if known, may have

been forgotten. The Panel expresses its appreciation for the Parties' and their respective

Counsel's allowing it to briefly share and explain such.

<u>Conclusion</u>. Enough is enough. This Panel means business, and its Orders will be fully

and faithfully complied with, one way or the other. The Panel of course deeply regrets having

10

to reach this juncture, as it is a most unpleasant, time-consuming, and distasteful situation for any Panel; however, when warnings are ignored, and thereafter, noncompliance is knowingly and willingly; ongoing; repeatedly noted, but not corrected; and so forth - - under such circumstances, then sanctions are due, earned, and merited, and correspondingly, this Panel must so issue and award them.

If Respondent's Director of Compliance fails and/or refuses to return the phone calls of its Counsel, then those are matters between those two (2) such individuals.  Noncompliance with Panel Orders is much greater and more significant than that, as such involves and effects everyone herein.  Due to *Rappaport*, local State-of-Florida Counsel must be retained; if Respondent wishes to maintain possession and control of the underlying File, documents, records, etc. and not timely share with nor transfer such to its local Florida Counsel, then these coordination-issues often may have adverse consequences.

The Parties and their respective Counsel are respectfully urged to recall in its first Order, Order #1, ¶5, with an asterisk, the Panel warned:

> * The Parties shall be, and the same hereby are, ADVISED of the
> Panel's concern of this matter, generally and specifically, including
> concerns over the Panel's involvement in these issues-at-bar.  The
> Parties are further CAUTIONED the Panel's Chairperson will not
> hesitate to: refer this type of discovery dispute to the Panel in its
> entirety for review (Please see Rule 10321(e)) and possible imposition
> of sanction, including attorney's fees and costs....

11

The Panel's Chairperson acted in conformity with Order #1 and its warning and referred this matter to the full Panel. The Parties, including Respondent and its Counsel, were obviously forewarned well in advance. <u>Despite even an asterisk's highlighting such</u>, the Panel's warnings were not heeded, but ostensibly ignored. Noncompliance with this Panel's Orders will not be tolerated.

ENTERED this _____ day of October, 2003.


                              ARBITRATION PANEL ("Panel")

                              (alphabetical order)


                              _____
                              Robert S. Bernard, Esq.
                              (Former ALJ, NY State Dep't.
                              of SS)


                              _____
                              Kathleen Church, CPA


                              _____
                              Kitty G. Grubb, Esq.
                              Chairperson

# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

Names of the Claimants
Robert and Alina Quintana JT TEN

Case Number: 03-02562

Name of the Respondent
Morgan Stanley DW Inc.

Hearing Site: Boca Raton, Florida

Nature of the Dispute: Customer vs. Member.

## REPRESENTATION OF PARTIES

For Robert and Alina Quintana JT TEN ("Quintanas"), hereinafter referred to as "Claimants":
Wayne Schwartz, Esq., Blum, Silver & Schwartz, LLP, Plantation, Florida.

For Morgan Stanley DW Inc. ("MSDW"), hereinafter referred to as "Respondent":  Todd A.
Zuckerbrod, Esq., Greenberg Traurig, P.A., West Palm Beach, Florida.

## CASE INFORMATION

Statement of Claim filed on or about:  April 4, 2003.
Claimants signed the Uniform Submission Agreement:  February 15, 2003.
Statement of Answer filed by Respondent on or about:  July 11, 2003.
Respondent signed the Uniform Submission Agreement:  July 7, 2003.
Motion for Sanctions filed by Claimants on or about:  May 21, 2004.
Response to Motion for Sanctions filed by Respondent on or about:  May 24, 2004.
Reply in Support of Motion for Sanctions filed by Claimants on or about:  May 25, 2004.

## CASE SUMMARY

Claimants asserted the following causes of action:  1) violation of industry rules; 2) violation
of Florida Statutes, Section 517; 3) breach of contract; 4) breach of fiduciary duties; 5)
common law fraud; 5) negligence; and 6) negligent hiring, supervision and retention of
employees.  The causes of action relate to the purchase of shares of stock, including
purchases made on margin, in Mastec, Inc, Avenue A, Palm Inc., Citrix Systems, Inc.,
Mattson Tech, Inc., Connecet Systems, Inc., Qual Com, Inc., Sycamore Networks, Inc.,
Exodus Communications, Inc., Last Minute.Com, Sunrise Technology and other unspecified
stock.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the
Statement of Claim and asserted various defenses.

# MORGAN STANLEY
## BOARD OF DIRECTORS:

March 31, 2005

To the Board of Directors of Morgan Stanley:

We regret that we must resort to another letter, but given your refusal to meet with us, we have concluded that this is the only way we can communicate with you. We are shareholders concerned with the best interests of the Firm, and we are expressing our concerns to you, our Board of Directors.

The issues which are foremost in our minds as we call for a new CEO are at the heart of your responsibilities in the areas of business performance and governance. A common proxy for measuring performance is share price. Morgan Stanley's stock has dramatically underperformed the relevant market indices and its peers over the last five years. The Firm's growth in earnings per share has been negative versus positive growth for our peer companies. Morgan Stanley's premium return on equity has eroded to where it is actually below that of our peer companies.

When you begin to look at performance by business segment, the reason for our stock's decline becomes clearer. In retail securities, we have experienced negative growth in revenues and our pre-tax margins are unacceptably low. The key to profitability in the asset management business is growth in assets under management, and our performance since 1998 has been mediocre at best.

The performance scorecard above summarizes Mr. Purcell's record since the merger. It is a failing report card.

We are also deeply concerned by the state of Morgan Stanley's relationship with regulators at both the Federal and State levels. Our reputation has been blemished further by a series of ill-handled court cases, most recently the Perelman/Sunbeam case in Florida. This unhappy state of affairs is not consistent with strong leadership at the top.

While Mr. Purcell points out with pride that the Board met three times to discuss our letter of March 3, we view with dismay the process by which the Board concluded that our concerns were groundless. The number of meetings obscures the question of the depth and rigor of the process: we do not believe that having brief telephone conversations with selected management members is the kind of rigorous fact-finding called for under these circumstances.

And finally, we view with dismay the manner in which the Board brought this matter to a conclusion this week. The loss of several key executives who were very important contributors to the success of this highly profitable institutional securities business – because they were unwilling to swear loyalty to an ineffective CEO – is an outrage. The departed leaders are highly regarded by the majority of our institutional shareholders. We view the Board's actions, including its apparent support of this "reorganization," as a failure of corporate governance, a failure to fulfill its fiduciary duties and a failure to act in the best interests of the shareholders of Morgan Stanley.

Our worst fears, highlighted in our first letter to you, that Mr. Purcell might remove senior executives in the Institutional Securities Group, have been realized. These departures have precipitated the worst kind of crisis for the Firm – unless immediate action is taken to reverse the loss of talent, the Firm's ability to restore its reputation and its competitive edge will be put at risk. We believe that the immediate removal of Mr. Purcell will stem the tide and possibly convince those who have left to return as leaders.

Finally, please remember that we are not just a small group of dissatisfied former employees. All of us held senior positions of leadership in the Firm and together own more than 11 million shares of Morgan Stanley stock. We care deeply about the Firm and remain ready to meet with you, face to face, to discuss our concerns.

Respectfully,

Anson M. Beard, Jr.

Lewis W. Bernard

Richard A. Debs

Joseph G. Fogg
Joseph G. Fogg

S. Parker Gilbert

Robert G. Scott

Frederick B. Whittemore

John H. T. Wilson

IF YOU AGREE WITH US, PLEASE CONVEY YOUR OPINIONS DIRECTLY TO MORGAN STANLEY'S BOARD BY SENDING YOUR SIGNED AND DATED LETTER TO THEM AT MORGAN STANLEY, SUITE D, 1585 BROADWAY, NEW YORK, NY 10036

NASD Dispute Resolution
Arbitration No. 03-02562
Award   Page 2

## RELIEF REQUESTED

Claimants requested compensatory damages of $150,000.00, plus interest at the legal rate of purchase, or reasonable market return, rescission, punitive damages, attorney's fees to be determined by a court of competent jurisdiction, the costs of this proceeding and such other relief as is deemed just and proper.

Respondent requested that all claims against it be dismissed, that forum costs be assessed against Claimants and such other relief as is deemed just and appropriate. In addition, Respondent notified Claimants of its intention to seek their prevailing party attorney's fees from a court of competent jurisdiction pursuant to Florida Statutes, Section 517.211(6).

## OTHER ISSUES CONSIDERED AND DECIDED

Claimants made a Motion for Sanctions for Respondent's failure to deliver Compliance Manuals in a timely fashion. The Motion for Sanctions was considered by the undersigned arbitrators (the "Panel") at the commencement of the evidentiary hearing and was granted. The parties have agreed that the Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions (if any), the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  Respondent is liable and shall pay to Claimant sanctions in the sum of $400.00, representing attorney's fees and costs, for Respondent's failure to deliver Compliance Manuals in a timely fashion.
2.  Claimants' claims are dismissed in their entirety.
3.  Any and all claims for relief not specifically addressed herein, including Claimants' claims for relief pursuant to Section 517, Florida Statutes, Claimants' requests for punitive damages, and requests for attorneys' fees, are denied.

## FEES

Pursuant to the NASD Code of Arbitration Procedure (the "Code"), the following fees are assessed:

### Filing Fees

NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
    Initial claim filing fee                  = $ 300.00

### Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the

NASD Dispute Resolution
Arbitration No. 03-02562
Award   Page 3

member firm that employed the associated persons at the time of the events giving rise to the dispute.  Accordingly, MSDW is a member firm and is a party.

| | |
|---|---|
| Member surcharge | = $1,700.00 |
| Pre-hearing process fee | = $ 750.00 |
| Hearing process fee | = $2,750.00 |

## Adjournment Fees
No adjournments were granted during these proceedings for which fees were assessed.

## Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court.  Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction.  These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during these proceedings.

## Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted.  A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less.  Fees associated with these proceedings are:

| | | |
|---|---|---|
| One (1)  Pre-hearing session with a single arbitrator @ $450.00 | | = $ 450.00 |
| Pre-hearing conference: | April 26, 2004 | 1 session |
| | | |
| One (1)  Pre-hearing session with the Panel @ $1,125.00 | | = $ 1,125.00 |
| Pre-hearing conference: | November 18, 2003 | 1 session |
| | | |
| Nine (9)  Hearing sessions @ $1,125.00 | | = $10,125.00 |
| Hearing Dates: | June 1, 2004 | 2 sessions |
| | June 2, 2004 | 2 sessions |
| | June 3, 2004 | 3 sessions |
| | June 4, 2004 | 2 sessions |
| Total Forum Fees | | = $11,700.00 |

The Panel has assessed the total forum fees of $11,700.00 to Respondent.

## Administrative Costs
Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services.  These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

NASD Dispute Resolution
Arbitration No. 03-02562
Award  Page 4

No administrative fees were incurred during these proceedings.

Fee Summary

Claimants are jointly and severally liable for:

| | |
|---|---|
| Initial Filing Fee | = $ 300.00 |
| Total Fees | = $ 300.00 |
| Less payments | = $ 300.00 |
| Balance Due NASD Dispute Resolution | = $ 0.00 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $ 5,200.00 |
| Forum Fees | = $11,700.00 |
| Total Fees | = $16,900.00 |
| Less payments | = $ 5,200.00 |
| Balance Due NASD Dispute Resolution | = $11,700.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to
Rule 10330(g) of the Code.

### ARBITRATION PANEL

*Charles Hoffman, Esq.*        -        *Public Arbitrator, Presiding Chairperson*
*Camille Besold*        -        *Public Arbitrator*
*Raymond W. Snow*        -        *Non-Public Arbitrator*

Concurring Arbitrators' Signatures

_____/s/_____
Charles Hoffman, Esq.                                    Signature Date
Public Arbitrator, Presiding Chairperson

_____/s/_____
Camille Besold                                    Signature Date
Public Arbitrator

NASD Dispute Resolution
Arbitration No. 03-02562
Award   Page 5

_____/s/_____
Raymond W. Snow                                    Signature Date
Non-Public Arbitrator

June 10, 2004
Date of Service  (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 03-02562
Award Page 4

No administrative fees were incurred during these proceedings.

**Fee Summary**

Claimants are jointly and severally liable for:

| | | |
|---|---|---|
| Initial Filing Fee | = $ | 300.00 |
| Total Fees | = $ | 300.00 |
| Less payments | = $ | 300.00 |
| Balance Due NASD Dispute Resolution | = $ | 0.00 |

Respondent is solely liable for:

| | | |
|---|---|---|
| Member Fees | = $ 5,200.00 |
| Forum Fees | = $11,700.00 |
| Total Fees | = $16,900.00 |
| Less payments | = $ 5,200.00 |
| Balance Due NASD Dispute Resolution | = $11,700.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

| | | |
|---|---|---|
| *Charles Hoffman, Esq.* | - | *Public Arbitrator, Presiding Chairperson* |
| *Camille Besold* | - | *Public Arbitrator* |
| *Raymond W. Snow* | - | *Non-Public Arbitrator* |

**Concurring Arbitrators' Signatures**

Charles Hoffman, Esq.                                   Signature Date
Public Arbitrator, Presiding Chairperson


Camille Besold                                          Signature Date
Public Arbitrator

Arbitration No. 03-02562
Award  Page 4

No administrative fees were incurred during these proceedings.

### Fee Summary

Claimants are jointly and severally liable for:

| | |
|---|---|
| Initial Filing Fee | ≈ $ 300.00 |
| Total Fees | ≈ $ 300.00 |
| Less payments | ≈ $ 300.00 |
| Balance Due NASD Dispute Resolution | ≈ $  0.00 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $ 5,200.00 |
| Forum Fees | ≈ $11,700.00 |
| Total Fees | = $16,900.00 |
| Less payments | ≈ $ 5,200.00 |
| Balance Due NASD Dispute Resolution | ≈ $11,700.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to
Rule 10330(g) of the Code.

### ARBITRATION PANEL

| | | |
|---|---|---|
| Charles Hoffman, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Camille Besold | - | Public Arbitrator |
| Raymond W. Snow | - | Non-Public Arbitrator |

### Concurring Arbitrators' Signatures

Charles Hoffman, Esq.                                    Signature Date
Public Arbitrator, Presiding Chairperson

*Camille Besold*                                          6/9/04
Camille Besold                                           Signature Date
Public Arbitrator

NASD Dispute Resolution
Arbitration No. 03-02562
Award Page 5

Raymond W. Snow
Non-Public Arbitrator

June 9, 2004
Signature Date

Date of Service (For NASD Dispute Resolution office use only)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

CIV. SEITZ

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**

Quintana, Robert & Quintana, Alina M.

**DEFENDANTS**

*Morgan Stanley DW, Inc.*

7 McALILEY

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Miami-Dade County, Fl
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Darren C. Blum, Esq.
Blum, Silver & Schwartz, LLP
12540 W. Atlantic Blvd.
Coral Springs, FL 33071

ATTORNEYS (IF KNOWN)

Tracy Nichols
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
(305) 789-7717

NIGHT BOX FILED

MAY 24 2005

CLARENCE MADDOX
CLERK USDC/SDFL/MIA

Docket: 05CV21401/PAS/McAliley

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE,   HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. GOVERNMENT NOT A PARTY)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "x" IN ONE BOX ONLY)

☐ 1 Original Proceeding

☒ 2 Removed from State Court

☐ 3 Remanded From Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgement

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury-- Med Malpractice | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | B☐ 630 Liquor Laws | PROPERTY RIGHTS | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 340 Marine | ☐ 370 Other Fraud | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 660 Occupational Safety/Health | ☐ 840 Trademarks | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment Of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | B☐ 690 Other | SOCIAL SECURITY | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 160 Stockholders suits | ☐ 360 Other Personal Injury | | LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS - Third party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☒ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is an action for breach of contract, promissory estoppel and breach of duty of good faith   Diversity jurisdiction is pursuant to 28 U.S.C. 1332 (a) and 1441 (c).

LENGTH OF TRIAL via __4 days estimated (for both sides to try entire case)

$250.00   9:21433

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☒ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☐ YES   ☐ NO

05/25/05

**VIII. RELATED CASE(S)** (See instructions):   Judge _____   Docket Number _____

**IF ANY**

Date   SIGNATURE OF ATTORNEY OF RECORD

5/24/05

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG, JUDGE_____